Mrs. Patsy **GRAHAM**, formerly Patsy Ruth Conley, natural mother, next of kin and legal guardian, for and on behalf of Bobby Conley, a minor, Plaintiffs,

v.

**BOARD OF EDUCATION, IDABEL SCHOOL DISTRICT NUMBER FIVE et al., Defendants.**

No. 75–46–C.

United States District Court, E. D. Oklahoma.

Sept. 20, 1976.

Gerald E. Kamins, Tulsa, Okl., for plaintiffs.

J. Harry Johnson, Oklahoma City, Okl., Larry L. French, Seminole, Okl., for defendants.

Before HOLLOWAY, Jr., Circuit Judge, DAUGHERTY, District Judge, and MORRIS, Chief Judge.

MORRIS, Chief Judge.

This three judge court was convened to consider the action brought by Mrs. Patsy Graham, formerly Patsy Ruth Conley, natu-

ral mother, next of kin and legal guardian of Bobby Conley, a minor. The defendants are the Board of Education, Idabel School District Number Five, and Don Wyrick, Bill Shupert, J. B. Hadley, Don Leatherwood, Earl Schipp and Woodrow Holman, as school board members and Charles Briley, Principal of Gray High School, Idabel, Oklahoma. It later developed that Woodrow Holman was not a school board member but was rather Superintendent of Schools.

In this action the plaintiff seeks to enjoin the enforcement of two Oklahoma statutes and a declaration that these statutes are unconstitutional on their face and as applied to this plaintiff. The first statute deals with the circumstances in which a pupil may be suspended from school and provides as follows:

"Any pupil who is guilty of immorality or violation of the regulations of a public school may be suspended by the principal teacher of such school, which suspension shall not extend beyond the current school semester and the succeeding semester; provided, the pupil suspended shall have the right to appeal from the decision of such principal teacher to the board of education of the district, which shall, upon a full investigation of the matter, determine the guilt or innocence of the pupil and its decision shall be final." 70 O.S. § 24–101.

The second statute is found in Oklahoma's criminal code and deals with corporal punishment. The statute in question is an exception to the general statute and accordingly both sections of the statute must be set forth in order to understand the relationship of the two sections. The statute provided as follows:[1]

"§ 843. *Beating or injuring of children— Penalty.*

Any parent or other person who shall willfully or maliciously beat or injure, torture, maim, or use unreasonable force upon a child under the age of seventeen (17), or who shall cause, procure or permit any of said acts to be done, shall be punished by imprisonment in the state penitentiary not exceeding five years, or by imprisonment in a county jail not exceeding one year, or by a fine of not more than Five Hundred Dollars ($500.00), or both such fine and imprisonment."

"§ 844. *Ordinary force as means of discipline not prohibited.*

Provided, however, that nothing contained in this Act shall prohibit any parent, teacher or other person from using ordinary force as a means of discipline, including but not limited to spanking, switching or paddling."

The complaint in this case was filed on February 27, 1975. Plaintiff also sought a temporary restraining order restraining defendants from "barring plaintiff's admission to Gray High School." An evidentiary hearing on the temporary restraining order was conducted by Judge Morris on March 10, 1975, and on March 11, 1975, an order was filed denying the requested temporary restraining order. The plaintiff appealed the order denying the temporary restraining order to the Court of Appeals for the Tenth Circuit and the case was lodged in that court until September 26, 1975, when the plaintiff's motion for a voluntary dismissal of his appeal was granted. After the case was returned to this court it was, following the filing of several motions and a pretrial conference, tried on May 11, 1976.

The Court finds the facts as follows: Bobby Conley enrolled in Gray High School in Idabel, Oklahoma, on December 9, 1974. He was 17 years old. On Monday, Tuesday and Wednesday, January 20, 21 and 22, 1975, he was absent from school and on Thursday, January 23, he returned to the school and presented a written excuse for his absences from his mother to the Assistant Principal, which stated that he had been ill on those three days. The Assistant Principal accepted the excuse for Monday and for Wednesday but refused to accept the excuse for Tuesday. On Monday, after having been in class for about an hour, Bobby went to the Assistant Principal, told him that he was sick and needed to go

1. This statute was amended in June, 1975, to increase the punishment for violations.

home. The Assistant Principal called his mother on the telephone and advised her; she requested that he be excused, and after receiving a checkout slip from the Assistant Principal, he was excused. On Wednesday, Bobby's mother called the Assistant Principal at about 10:00 or 11:00 a. m. to report that Bobby was sick at home. On the basis of this phone call he was excused for Wednesday.

On Tuesday, however, Bobby came to school but did not go to class. He had a discussion with Coach Alton, who saw him in his friend's car. He told the coach that he was sick and the coach told him that he should go to the office and get an absence slip. Bobby testified that he did not go to the office and did not get an absence slip because he was afraid he would get in trouble and instead he waited until his friend got out of class, at which time he was taken home by him. Because Bobby had a checkout slip for Monday and an excuse for Wednesday, but did not have a checkout slip for Tuesday, was seen at school, had a discussion with Coach Alton and was told to get a checkout slip, but did not get one, the Assistant Principal declined to excuse him for his absence on Tuesday. And Bobby was told on Thursday by the Assistant Principal, when he presented the written excuse from his mother, "Bobby, I will accept Monday because I checked you out on Monday; I will accept Wednesday because your mother called Wednesday and said you were home sick. But, I will not accept Tuesday because you were on the campus, you were sent to the office and did not come, you did not check out. If you were sick, all you had to do is come to the office and go through the same procedure you did Monday." (Tr. 29). Bobby was also told on Thursday what the penalty was for playing hookey. The Assistant Principal testified, "I told him that our penalty for playing hookey was three licks with a board or double the time he was out." (Tr. 30). Bobby then told the Assistant Principal that he wanted him to call his mother, and the Assistant Principal told him, "Bobby, we have several other things that we need to discuss with your mother. I don't want

to call her on the phone because I cannot talk to her on the phone about this. I want you to go get your mother, come back to the office with her and we will discuss this matter further." (Tr. 31–32).

The discussion between Bobby and the Assistant Principal concerning his unexcused absence on Tuesday took approximately ten minutes. Bobby left the Principal's office, called his mother but did not return to school with her. She arrived approximately 15 or 20 minutes later and for an hour or an hour and a half discussed the matter with the Assistant Principal, the Senior High Principal, the Junior High Principal, and one of the coaches. The policy of the school concerning absences and the discipline imposed for absences was discussed with Bobby's mother; she was told why Bobby's absence on Tuesday was not excused, whereupon, according to the testimony of the Assistant Principal, "she immediately got mad" and told the Assistant Principal, "That is none of your damn business or the school's, if I write an excuse it will be accepted or I will go to the Supreme Court and you will be the laughing stock of Idabel before it is all over." (Tr.33).

During this same meeting with Bobby's mother, those present were told by her that Bobby had received a prior injury and that he could not take swats with a paddle. She was then told by the Assistant Principal that under those circumstances he would *not* be paddled if he would bring a slip from a doctor indicating that he should not be. She was also told that a slip from Bobby's step-father, who is a physician, would be acceptable.

It was made clear to Bobby and to his mother that his excuse for his absence on Tuesday was not accepted, that he would not be readmitted to school until he submitted to one or the other of the alternative punishments, but that he would not be subjected to paddling if he brought a note from a physician, including Bobby's step-father. Bobby's mother requested an emergency hearing of the school board.

On February 3, 1975, a meeting of the Board of Education of Idabel School Dis-

trict Number 5, Idabel, Oklahoma, was held, at which time the Board considered the disciplinary action imposed upon Bobby Conley. Present at the meeting were Bobby Conley, his mother and his step-father. In addition they were represented by counsel. They were afforded full opportunity to present everything to the Board which they wished to present, both in terms of evidence and argument. The minutes of the meeting reveal that counsel argued that the discipline imposed upon Bobby by the Assistant Principal was arbitrary and capricious and had no relationship to the alleged violation of being absent from school without a proper excuse. He also argued that corporal punishment should be abolished at the school not only for Bobby but for all students.[2]

At the conclusion of plaintiff's presentation to the School Board the members unanimously voted to uphold the action of the Assistant Principal with respect to Bobby's discipline and refused to abolish the school policy which permits corporal punishment.

Subsequent to the events which transpired on Thursday, January 23, both Bobby and his mother refused to permit him to submit to either of the alternative forms of punishment. She specifically testified that she objected to him being detained at school after hours to make up the hours he missed on Tuesday on account of his unexcused absence. And from January 23, 1975, forward he did not attend the Gray High School and was not attending when this case was heard on May 11, 1976. Neither Bobby nor his mother made any attempt to seek readmission and the school authorities made no attempt to solicit his readmission.

Although Bobby was not formally suspended pursuant to a document or letter of any kind, he was in effect suspended until he was willing to subject himself to one of the two disciplinary measures imposed upon him or until January of 1976. Subject to state law requirements concerning transfer of credits earned in a Texas school prior to enrolling at Gray High School, he was eligible to return to Gray School at the commencement of the semester which started in January of 1976 without the imposition of any disciplinary measure of any kind.

We start as we must, ever mindful of the principle that:

"Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint . . . By and large, public education in our Nation is committed to the control of state and local authorities. Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968) (footnote omitted).

Plaintiff argues in this case that due process requirements imposed by the Fourteenth Amendment were not afforded Bobby Conley. It is argued first of all that the disciplinary sanctions which are imposed for unexcused absences were not contained in the Gray High School Student Handbook. Plaintiff does not contend that he did not know about the sanctions but argues that there was no written policy setting them forth. It is admitted that the written sanctions are not contained in the handbook but the evidence reveals and the court finds that students are made aware of these policies at high school assemblies, through the student council and by word of mouth. There seems to be no doubt that the entire student body was fully aware of the sanctions. Certainly Bobby Conley knew that the rules of Gray School forbade him to play hookey.

■  The evidence is in dispute concerning whether or not Bobby Conley was in fact playing hookey from school and was riding around with his friend, as the evidence shows he did on other occasions during physical education class hours, or whether he was in fact ill and unable to attend school. It is not the function of this court to sit as a reviewing court with re-

---

2. It should be noted that this is not a class action and plaintiff does not so contend.

spect to if or when or what disciplinary sanctions should be imposed on students who have been found by the school authorities to have been playing hookey. It simply is not "the role of the federal courts to set aside decisions of school administrators . . ." even if the court views the decisions "as lacking a basis in wisdom or compassion. . . . The system of public education that has evolved in this Nation relies necessarily upon the discretion and judgment of school administrators and school board members . . ." and their actions are not reviewable if they "do not rise to the level of violations of specific constitutional guarantees." *Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 1003, 43 L.Ed.2d 214 (1975). Thus, the question before this court is whether or not Bobby Conley's constitutional rights have been infringed and whether 70 O.S. 24–101 is unconstitutional on its face or as applied to him.

The Supreme Court in *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) set forth the due process requirements to be observed in instances involving student suspension from school. That case involved several students, each of whom had been temporarily suspended from school. In each instance neither the student nor the student's parents were given *any* notice or hearing *prior* to the suspension. The court accordingly concluded that a ten day suspension without notice and hearing of any kind deprived those students of liberty and property without due process of law.

For future guidance to both courts and school administrators the Court pointed out that a disciplinarian contemplating sanctions should inform the student of his "defalcation and to let him tell his side of the story in order to make sure that an injustice is not done" 419 U.S. at 580, 95 S.Ct. at 739. The Court further stated:

"There need be no delay between the time 'notice' is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred. We hold only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis for the accusation is." 419 U.S. at 582, 95 S.Ct. at 740.

\* \* \* \* \* \*

"We stop short of construing the Due Process Clause to require, countrywide, that hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge or to call his own witnesses to verify his version of the incident." 419 U.S. at 583, 95 S.Ct. at 740.

Turning to the events in this case it is uncontroverted that when Bobby brought his written excuse to the Assistant Principal's attention on Thursday, he was then told that his absence from classes on Tuesday was unexcused. He was also told why it was unexcused; that he was present on the school grounds in his friend's car; that he had a discussion with the coach; that he was told by the coach that he should go to the office and check out, which instruction he declined to follow, and that in view of these facts his absence must be treated as unexcused. He was further told that for this dereliction he must submit to three licks or be detained after school for a period of time double the class hours missed on Tuesday. Clearly he was given every opportunity to "tell his side of the story."

Further, the Assistant Principal was concerned about Bobby. He had had many prior absences from class (Defendant's Exhibit 1)(Tr. 15). He accordingly told him, "Bobby, we have several other things that we need to discuss with your mother. I don't want to call her on the phone because I can't talk to her on the phone about this. I want you to go get your mother, come back to the office with her and we will discuss this matter further." (Tr. 30–31). Whereupon Bobby left. He did not return as requested. There is no intimation that his failure to return was because of illness. But his mother did return in about 15 or 20 minutes. There ensued a 60 to 90 minute

discussion. The entire matter was fully discussed again; Mrs. Graham was told that Bobby's absence on Tuesday would be treated as unexcused and why it was being treated as unexcused. Thus, unlike the facts in *Lopez*, she too was clearly aware of Bobby's dereliction as related to her by the school's disciplinarian. And she disagreed with what she had heard and informed the school disciplinarian of her displeasure with his decision not to accept her written excuse, saying "That is none of your damn business or the school's, if I write an excuse it will be accepted or I will go to the Supreme Court and you will be the laughing stock of Idabel before it's all over." (Tr. 33).

It simply cannot be said, therefore, that Bobby Conley or his mother were in the dark or were not informed of his dereliction. He had all the notice and hearing that the fourteenth amendment requires. The teachings of Lopez were fully met. Bobby Conley was not formally suspended from Gray School for even one day or for any other period of time. It is clear from the record that outright suspension was not the sanction imposed. The sanction imposed was three licks or detention after school. Suspension was conditioned on his acceptance of one or the other of the sanctions. However, corporal punishment would be excused by a physician's note. Bobby's mother has steadfastly taken the position from the date she met with the school authorities until the date of trial that she would not permit Bobby to be subjected to *either* detention or licks. But the record is clear that it was understood both by Bobby's mother and by the school authorities that unless he returned to school and accepted one of the two forms of discipline imposed upon him he could not return to school. He was thus entitled to the informal hearing which he and his mother received. *Hatch v. Goerke*, 502 F.2d 1189 (10th Cir. 1974).

Following the hearing accorded to Bobby and his mother, she requested an emergency hearing before the School Board. The hearing was granted. 70 O.S. § 24–101

provides that if a pupil is suspended from school for violation of the regulations, he shall have the right to appeal to the School Board, which board "shall, upon a full investigation of the matter, determine the guilt or innocence of the pupil and its decision shall be final." At the hearing evidence and argument was presented by counsel for Bobby and the board heard "everything they had to say" (Tr. 81) following which the Board denied the request for reinstatement of Bobby and denied the request by Bobby to abolish corporal punishment.

■ Bobby, his mother and his lawyer have all presented his side of the controversy. He has had more than ample opportunity to present his views. He has not been deprived of any fourteenth amendment rights. Two hearings and one appeal are enough.

■ Plaintiff also argues that the statute by its terms is void because there is not written into the statute any "requirement for a hearing of any kind" and because of vagueness. Apart from *Lopez*, which the court has already discussed, plaintiff has directed the court's attention to no authorities in support of his argument. In *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) the Supreme Court had before it the question of whether an Oklahoma statute was unconstitutional on its face because of asserted vagueness and overbreadth. The court noted that the statute as applied was clearly applicable to those who challenged it. And significantly the Court noted:

"Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court. . . . A closely related principle is that constitutional rights are personal and may not be asserted vicariously. . . . These principles rest on more than the fussiness of judges. They reflect the conviction

that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws." 413 U.S. at 610–611, 93 S.Ct. at 2915 (citations omitted). The fact that the statute has "no requirement for a hearing of any kind" is of small moment to one who has had two hearings and one appeal. As Justice Holmes once observed, "if there is any difficulty . . it will be time enough to consider it when raised by someone whom it concerns." *United States v. Wurzbach*, 280 U.S. 396, 399, 50 S.Ct. 167, 169, 74 L.Ed. 508 (1930).

Turning now to 21 O.S. § 844, plaintiff argues that it "sanctions corporal punishment only with the vague and insufficient restraint that it be administered 'using ordinary force as a means of discipline.' " He then asks "what guide lines have been incorporated at Gray High School to control and regulate the use of corporal punishment? The answer is conspicuously easy to arrive upon . . . No written procedures at all." (Plaintiff's brief, pp. 11–12). [On oral argument plaintiff made it clear that he was not contending that corporal punishment constituted cruel and unusual punishment in violation of the Eighth Amendment.]

█ Plaintiff brings to this court's attention not one authority which holds that a statute authorizing corporal punishment should be declared unconstitutional for the reasons he asserts. And this court has found none. Furthermore, the statutes do not apply to plaintiff. The two sections read in part as follows:

"§ 843. *Beating or injuring of children—Penalty.*

Any parent or other person who shall willfully or maliciously beat or injure, torture, maim, or use unreasonable force upon a child *under* the age of seventeen (17) . . .."

"§ 844. *Ordinary force as means of discipline not prohibited.*

Provided, however, that nothing contained *in this Act* shall prohibit any parent, teacher or other person from using ordinary force as a means of discipline, including but not limited to spanking, switching or paddling." (Emphasis added).

Sections 843 and 844 must be read together. They are part of the same act. Section 843 applies only to children *under* the age of 17. Section 844 is an exception to Section 843; it, too, applies only to children *under* the age of 17. Bobby was 17 when these events occurred. Furthermore, it is admitted that Bobby was never subjected to corporal punishment and a note from any physician would excuse the corporal punishment alternative. Thus, Bobby cannot even show a threatened impairment of his constitutional rights, much less a real and immediate impairment. Under such circumstances he does not have standing to challenge the constitutionality of the statute. *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Black Coalition v. Portland School District No. 1*, 484 F.2d 1040 (9th Cir. 1973).

The Court has carefully considered all of plaintiff's claims and finds all of them to be unfounded. The action should be dismissed.