**Daniel K. PALMER, et al., Plaintiffs,**

v.

**Peter L. MERLUZZI, et al., Defendants.**

**Civ. No. 86–4673.**

United States District Court,
D. New Jersey.

May 2, 1988.

---

Schaff, Motiuk, Gladstone, Moeller & Ligorano by G. Jeffrey Moeller, Flemington, N.J., for plaintiffs.

Rand, Algeier, Tosti, Woodruff & Frieze by John E. Croot, Jr., Morristown, N.J., for defendant.

## ORDER

CLARKSON S. FISHER, District Judge.

The court having received a report and recommendation from the Honorable Freda L. Wolfson, United States Magistrate, and the court being in agreement with the report and recommendation, it is on this 2nd day of May, 1988,

ORDERED that the report and recommendation of the magistrate dated and filed April 13, 1988, recommending that Counts One through Four of the Complaint be dismissed with prejudice, and that

Counts Five and Six of the Complaint be dismissed without prejudice is approved and adopted by the court.

Civ. A. No. 86–4673(CSF).

REPORT AND RECOMMENDATION

FREDA L. WOLFSON, United States Magistrate.

This litigation involves, *inter alia*, plaintiff Daniel Palmer's (Palmer) claim that defendants, Peter L. Merluzzi (Merluzzi) and the Hunterdon Central Board of Education (The Board of Education) violated plaintiff's Fourteenth Amendment right to due process when they suspended him from participating in extracurricular events for sixty days. In the instant motion, defendants have moved for summary judgment. Plaintiff opposes this motion and has cross-moved to compel defendants to provide certain discovery.[1] These motions were referred to me by the Honorable Clarkson S. Fisher, U.S. District Judge.

BACKGROUND

At all relevant times, Palmer was a senior at Hunterdon Central High School (the High School) located in Raritan Township. Merluzzi was the Superintendent of Schools for the Hunterdon Central Regional School District. The Board of Education is the duly elected governing body for the Hunterdon Central Regional School District.

Daniel Palmer was a starting wide receiver on the high school football team. He also was enrolled in a high school course known as "Careers in Broadcasting". On the evening of September 28, 1986, in conjunction with this course, Palmer and three other students had been assigned to the high school radio station. The next morning, school administrators questioned the students, including Palmer, about the discovery of beer stains and a marijuana pipe at the radio station. At this meeting, Palmer admitted to Dr. Paul Grimm, the school disciplinarian, that he had smoked marijuana and drank beer the previous night at the radio station.

Palmer was then suspended by Dr. Grimm for ten days pursuant to *Policy 5380* of the High School[2] and the *Student Handbook.*[3] This suspension applied to both curricular and extracurricular activities of the school. Dr. Grimm telephoned Palmer's father, James Palmer, later that morning to inform him about the incident and the resulting suspension. Written confirmation of the ten day suspension dated September 30, 1986 was mailed to Palmer's parents and received on or about October 2, 1986. In that letter, Dr. Grimm specified the dates of suspension as being September 30 through October 13, 1986. This letter made no mention that any additional penalties were being considered.

1. Plaintiffs seek the production of Palmer's personnel records, all school disciplinary records involving drug and/or alcohol abuse in the last five years and to depose Superintendent Merluzzi and varsity football coach Mr. Meest.

2. Policy 5380 in pertinent part states:
   "This policy is an attempt to spell out a procedure for reacting to various kinds of drug abuse that is consistent with the rights of the individual in our society, with the objectives of this school, with the laws of our society, and with the protection of the majority."
   Furthermore, "No part of Hunterdon Central's drug policy is intended to or shold be used to abrogate individual civil rights. No student will be suspended temporarily without due process. A student will have conferences as defined on Page 4 in suspensions lasting one week or less. No student will be suspended for an extended period without a

formal hearing before the Board of Education. He will be told what he is accused of and the evidence supporting the accusation; he will be allowed to present his version of things; and he will be granted the right of legal representation.

3. The Student Handbook provides for a ten-day suspension for a first offense involving the use/possession of drugs/alcohol Specifically, the handbook provides that:
   A. "If alcohol and/or drug use is confirmed:
   1. First offense after hearing by principal or designee
   a. Penalty—10 days suspension
   b. The parents will be strongly encouraged to enroll the student in an approved drug rehabilitation program.
   B. If *possession* of drugs/alcohol and or drug paraphernalia is confirmed:
   1. First offense after hearing by principal or designee. Penalty—10 days suspension.

On or about October 3, 1986, Dr. Grimm, Merluzzi, and several other administrators met to consider whether additional punishment should be imposed upon Palmer and the other students. Specifically, the possibility of suspending the students from extracurricular activities was discussed. Apparently, the majority of the administrators present agreed that suspension from extracurricular activities was warranted.[4] However, a definitive decision to impose an additional penalty was not made at this juncture.

Thereafter, Merluzzi contacted two local drug and alcohol rehabilitation centers for a recommendation as to how to handle the situation. Specifically, Merluzzi sought information concerning "what would [be] ... a reasonable period of time to accomplish some change in attitude amongst those individuals." (T 125)[5] Merluzzi did not inform the representatives he questioned that he was considering suspending the students from extracurricular activities. Merluzzi was told that sixty days was a reasonable period of time "to undergo some change". *Id.* Besides the incident in question, there was no evidence before Merluzzi that Palmer was a drug/alcohol abuser or that he had even previously used drugs or alcohol; Merluzzi did not even review Palmer's file before contacting the rehabilitation centers.

On or about October 9, 1986, Palmer's father heard rumors that additional penalties might be imposed on his son. Mr. Palmer telephoned Dr. George Collier, President of the Board of Education, to discuss his concerns. During that conversation, Mr. Palmer was advised by Dr. Collier to address the matter in writing to the Superintendent of Schools, and further, that the matter might be discussed in more detail at a Board of Education meeting scheduled for October 13, 1986. Neither Mr. Palmer or his son ever received formal notice that further disciplinary action

against Dan Palmer was being considered or that they should attend the upcoming Board meeting.

Sometime before the October 13th Board of Education meeting, Merluzzi decided to recommend to the Board that Palmer and the other students be suspended from extracurricular activities for sixty days.[6] In reaching this decision, Merluzzi primarily relied on Policy 138 which states in pertinent part:

"No student may participate in a scheduled event if he was not in attendance on the day of the athletic event, or the day preceding a weekend event. *No student may participate who has not demonstrated good citizenship and responsibility.* No student who has not returned all equipment may participate in a succeeding season." (Emphasis added).

Prior to the commencement of the Board meeting, Merluzzi and Palmer's father accidently met in the hallway. Palmer's father questioned Merluzzi if he was going to recommend that his son face additional penalties. Merluzzi stated that he was going to recommend that a sixty day extracurricular suspension be imposed. Shortly thereafter, the meeting began. Nothing was mentioned about the possible additional suspensions until Palmer's father inquired about his son's status. The Board then retired into executive session and heard statements made by Palmer's father and the recommendations of Merluzzi. After the conclusion of the meeting, no formal action was taken by the Board and the matter was apparently referred back to Merluzzi for further review. Shortly thereafter, Merluzzi informed Palmer's father that a sixty day extracurricular suspension would be imposed.

After the imposition of the extracurricular suspension, plaintiff made application before the New Jersey State Commissioner of Education for review of the actions of

---

**4.** Dr. Grimm did not believe that any additional penalties should be imposed.

**5.** Transcript of Proceedings before Administrative Law Judge Bruce R. Cambell on October 20, 1988.

**6.** October 13, 1986 was the ninth day of the ten day school suspension.

the Board of Education and Merluzzi. Specifically, Palmer sought injunctive relief 1) to set aside the ten day school suspension, 2) to set aside the sixty day suspension from extracurricular activities, and 3) to order the reinstatement of Palmer and the expungement of the incident from his records.

On October 20, 1986, a hearing was conducted before the Honorable Bruce R. Campbell, A.L.J. Judge Campbell, in a written opinion, found that the "ten-day out-of-school suspension was procedurally faultless and consistent with announced policy." *D.K.P. By His Guardian Ad Litem J.P. and J.P. and B.P. v. Board of Education of Hunterdon Central Regional School District and Peter L. Merluzzi, Superintendent,* OAL Dkt. No. EDU 7004–86 at 3 (October 21, 1986). Therefore, the request to set aside and expunge the ten-day suspension was denied.

Concerning the extracurricular suspension, Judge Campbell found that the defendant's conduct denied Palmer due process and thus he remanded this issue to the Board for proceedings consistent with the decision. Specifically, Judge Campbell held,

1. Extracurricular activities, contrary to what the name implies, are part of the organized activities of the school; that is, the curriculum.

2. A board of education has the right, under particular circumstances, to exclude pupils from extracurricular activities.

3. An exclusion from this part of the curriculum for more than ten days may not, in right reason and basic fairness, be accomplished without furnishing the affected pupil advice of the proposed exclusion and an opportunity to be heard.

4. "This is not to imply that a full dress judicial hearing with a right to cross-examine witnesses is required." *Dixon v. Alabama,* 294 F.2d 150, 158–159.

5. In a case such as the present matter, the necessary elements of due process relative to an exclusion from extracurricular activities can be provided in the general suspension process provided that that part of the penalty going to extracurricular activities be made known to the pupil at the time.

6. In the present case, a ten-day suspension was imposed, was consistent with what pupils and parents would expect from reading The Informational Calendar and Student Handbook (J–2) and was in its ninth day before pupil and parents had any official notice that an additional penalty was being considered.

7. This eleventh hour, additional penalty, coming without official notice and without any chance to be heard, flies in the face of all notions of fundamental fairness.

The Commissioner of Education affirmed the finding of the Administrative Law Judge regarding the suspension for ten days. However, the Commissioner set aside the stay of the sixty day extracurricular suspension previously imposed. Specifically the Commissioner found:

The record shows that he [Merluzzi] consulted existing Board policy on interscholastic athletics (J–7), as well as policies 536 (J–3), 537 (J–4), and 538 (J–5) relating to school discipline and drugs. Based upon such review, he consulted with other members of the faculty and staff, as well as two external counseling agencies, before making a determination to add an additional penalty of the 60–day exclusion from extracurricular activities. Upon his review of the aforementioned documents, the Commissioner is convinced that the action taken by the superintendent was consistent with the responsibilities delegated to him by the Board which did not specifically require Board approval prior to their imposition, even though the superintendent did ultimately bring the matter to the Board.

In reaching the conclusion above, the Commissioner is mindful of the heavy responsibility which rests upon school administrators to deal swiftly and decisively with incidents of drug use within the school environment. He takes particular note of the fact that D.K.P. does not deny the fact that he knowingly and de-

liberately consumed alcoholic beverages and smoked a controlled and dangerous substance within the school environment. He could not or should not have been unaware of the fact that his role as a member of the football team, as well as his status as a student in the school, was in jeopardy when he decided to take the actions he did. The seriousness of the undisputed offenses committed by the student in this matter cannot be overstated. Not only was there alcohol on school property involved but also drugs. As was stated in *E.E. v. Bd. of Ed. of Township of Ocean,* 1971 S.L.D. 71:

> "Offenses involving the abuse of drugs are a serious menace to the mental health of our society, and the introduction and abuse of drugs in the public schools must be dealt with swiftly, in order to prevent their further introduction to other students."

And just as in that case wherein E.E. had deliberately acted in violation of school policy and the state laws on school grounds, the Commissioner determines herein that the Board's action denying the privilege of participation in an extracurricular activity to be a reasonable exercise of the Board's discretionary authority.

*Id.* at 5–6. The Commissioner directed the Board of Education to grant Palmer and his parents an immediate opportunity to informally present their reasons for mitigation or the setting aside of the suspension.

Plaintiff appealed the Commissioner's ruling to the Appellate Division of the Superior Court of New Jersey seeking to stay the ban from all extracurricular activities. The Appellate Division denied this application. Plaintiff then appealed the decision of the Appellate Division to the New Jersey Supreme Court. The New Jersey Supreme Court declined to hear the matter.

On October 27, 1986, Palmer's attorney presented oral argument to the Board. The next day, plaintiff was notified in writing of the Board's decision affirming the penalty imposed by Merluzzi.

On November 25, 1986 plaintiff filed a complaint in this court. On March 25, 1987, on petition by plaintiff, the Commissioner dismissed the matter without prejudice. The only pending action is the one before this Court.

### DISCUSSION

#### 1. *Property Interest—Due Process*

█ Palmer alleges in Count I of his complaint that the defendants violated his right to due process under the Fourteenth Amendment when they suspended him from participating in extracurricular activities for sixty days without notice and a hearing.[7] Palmer claims that participation by students in extracurricular activities rises to the level of a property interest and, therefore, he had the right to procedural due process before defendants imposed the suspension on him. Defendants have moved for summary judgment on the ground that New Jersey and the majority of jurisdictions do not recognize a student's property interest in extracurricular activities, and, there being no property interest, Palmer was not entitled to due process protection before the suspension was imposed.

The purpose of the summary judgment rule is the avoidance of the delay and expense of an unnecessary trial where the circumstances of the case, the applicable law and the facts, are ripe for such procedure. *Goodman v. Mead Johnson Co.,* 534 F.2d 566, 573 (3d Cir.1976), cert. denied 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). *Celotex v. Catrett,* 477 U.S. 317, 106 S.Ct. 2448, 91 L.Ed.2d 265 (1986). *Fed. R.Civ.P.* 56 provides for the granting of summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law". As the moving party

---

**7.** Palmer does not attack the propriety of his initial 10 day suspension from school and extra-curricular activities.

bears the burden of demonstrating that there is clearly no genuine issue of material fact, all doubts will be resolved against the moving party. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1611, 26 L.Ed. 142, 155 (1970); *Anderson v. Liberty Lobby*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2519, 91 L.Ed.2d 202, 216 (1986).

Both the plaintiffs and defendants have submitted an extensive factual record in connection with this motion. The bulk of these facts relate to the events preceding Palmer's sixty day extracurricular suspension. However, concerning Count One of the complaint, the only *material* issues of fact are whether Palmer's suspension was imposed and pursuant to what authority the defendants acted. There is no dispute as to these material facts: Palmer was suspended and the defendants acted pursuant to *School Policy* 138. Plaintiff's proposed discovery will not shed any additional light on these points. The issue before the Court is a question of law and is, therefore, ripe for disposition on a motion for summary judgment.

The Fourteenth Amendment to the United States Constitution prohibits state action which deprives "any person of life, liberty or property without due process of law". The threshold question in this case is whether Daniel Palmer's interest in participating in extracurricular activities rises to the level of a property interest protected by procedural due process. If Palmer has a property interest in participating in extracurricular activities then the inquiry shifts to what process he is due before his "right" to participate is denied. *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1974). If Palmer has no protectible liberty or property interest then the constitutional guarantee of due process is not applicable to defendants' interference with his participation in extracurricular activities.

First, I will consider Palmer's claimed property interest. Property interests are not created by the constitution but rather "are created and their dimensions defined by existing rules or understandings that stem from an independent source such as

state law." *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, 561 (1972); *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684, 690 (1976). Property interests must reflect a person's "legitimate claim of entitlement to a specific government benefit" and not an "abstract need or desire" or a "unilateral expectation." *Board of Regents v. Roth, supra.*

On the basis of state law, Palmer undeniably had a legitimate claim of entitlement to a public education. *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). New Jersey law requires that local authorities are to provide a free education to all residents over five and under twenty years of age, *N.J.S.A.* 18A:38–1, and compulsory attendance in schools is required of all students between the ages of six and sixteen, *N.J.S.A.* 18A:38–25. While no New Jersey statute or law specifically creates an obligation on schools to provide extracurricular activities, New Jersey does, however, require public schools to offer "[a] breadth of program offerings designed to develop the individual talents and abilities of pupils". *N.J.S.A.* 18A:7A–5(d). And "[e]xtracurricular activities, including interscholastic athletics, play an integral part in satisfying the breadth of programs requirement . . ." *Burnside v. N.J.S.J.A.*, Docket Number A–625–84T7, November 15, 1984 (unpublished opinion). *See also, Smith v. Paramus Bd. of Ed.*, 1968 S.L.D. 62, *citing,* Evaluative Criteria (1960 ed) of National Study of Secondary School Evaluation ("The School provides for two general kinds of educational experience, the regular classroom activities, and those called extracurricular or cocurricular. Together they form an integral whole aimed toward a common objective.").

New Jersey case law on whether a student has a property interest in extracurricular activities is scant to say the least. However, this is where the court must turn to determine whether Palmer has such a protectible interest. In *Burnside v. N.J. S.A., supra,* high school students and parents challenged a rule promulgated by the New Jersey State Interscholastic Athletic Association (N.J.S.I.A.A.) which required

that students pass 23 academic credits per year in order to be eligible to compete in interscholastic athletic competition. The students claimed that they had a constitutional right to participate on their high school's interscholastic athletic teams.

The Appellate Division disagreed. While the court found that extracurricular activities, including interscholastic athletics, "are important factors toward a sound and comprehensive academic education", *Id.* at 5, it emphasized that "each pupil does not have a right to participate in interscholastic athletics.... [but] each pupil has a right to the opportunity to participate in interscholastic athletics and other extracurricular activities. That opportunity may not be hampered by discrimination in the participants selection." *Id.* at 5–6.

Four recent cases decided by the New Jersey Commissioner of Education have reached a similar conclusion.

In *EE v. Ocean Township Bd. of Ed.*, 1971 S.L.D. 97, a student admitted smoking marijuana on school grounds during school hours. He was suspended from school for approximately six months. Upon his readmission to school, his curriculum was limited by the Board to only courses necessary for graduation or for college admission and he was banned from participating in or attending all extracurricular activities.

The student challenged the Board's decision as excessive, arbitrary, and unduly harsh. He also claimed that the Board did not have the authority to impose the aforementioned sanctions. In response, the Board argued that since it had statutory authority to suspend and expel students it logically had the authority to take lesser action against students such as the restriction of a school schedule and suspension from participation in all extracurricular activities.

The Commissioner upheld the extracurricular suspension but set aside the Board's restriction of the student's school schedule. Concerning the suspension from participation in extracurricular activities the Commissioner found:

> Offenses involving the abuse of drugs are a serious menace to the mental health of our society, and the introduction and abuse of drugs in the public schools must be dealt with swiftly, in order to prevent their further introduction to other students.

> The Commissioner determines that the Board's action denying the privilege of participation in extracurricular activities is a reasonable exercise of the Board's discretionary authority. Certainly this area of student involvement is less rigidly supervised than those regular activities occurring in the school day. Petitioner has deliberately acted in violation of school policy and the State laws on school grounds and during the school day. The confidence students expect of their teachers and administrators ordinarily should be and hopefully can be taken for granted. However, when a student decides that this confidence can be cast aside lightly, it must then be earned again before the student can expect to be accepted with the full trust he enjoyed before the incident.

*Id.* at 101.

In *Dennis v. Homdel Bd. of Ed.*, 1977 S.L.D. 388 (1977), a high school student was suspended from the high school football team and denied his athletic letter because he violated training rules by consuming alcohol during the season. The student apparently did not dispute his suspension but argued that he was unaware that he could forfeit his letter by drinking. He also contended that he was denied due process because he was never given a full hearing to present his side of the incident.

The Commissioner of Education upheld the suspension and the denial of the athletic letter. He held that "[I am] not aware of any law or administrative rule supporting petitioner's argument that he was denied procedural due process because he was never afforded a hearing before the Board. *It must be remembered that participation in interscholastic athletics is a privilege which is subject to rules made by local boards of education".* *Id.* at 39 (Emphasis added).

The decision in *Dennis* has been reaffirmed in two recent cases. See, *H.O. v.*

*Montgomery Township Board of Education,* OAL Dkt. Edu. 6887–85 (March 12, 1986) adopted by Comm'r of Ed. (April 28, 1986) and *L.L.S. v. Bd. of Ed. of the Borough of Haddonfield,* OAL Dkt. EDU. 5009–86 (September 26, 1986) adopted by Comm'r of Ed. (October 30, 1986) (no right to participate in school band as a drum major).

In *H.O. v. Montgomery Township,* a student challenged a soccer coach's authority to prefer underclassmen over seniors for the junior varsity soccer team. Concerning the student's "right" to participate in interscholastic sports the ALJ noted:

> The petitioner cites to no authority for the proposition that a senior—or any grade or age student—has a right to be on a varsity soccer team where Board rules do not so require. The absence of supporting authority is not surprising. The case law clearly holds that there is no right to participate in extracurricular activities. *Dennis v. Holmdel Bd. of Ed.,* 1977 S.L.D. 388. As the Commissioner made plain in *Dennis,* participation in sports at public schools "is a privilege" not a right. *Id.* at 390. It is within this legal context that the petitioner's claims must be examined.
>
> If H.O. has no legal right to be on the varsity soccer team, then any claim to play which he may possess must be predicated upon a showing of arbitrary or unlawful conduct by the respondents. No such showing has been made here.

*Id.* at 16. This decision was adopted by the Commissioner. He emphasized that "New Jersey case law clearly holds that there is no right to participate in cocurricular activities. *Dennis v. Holmdel Bd. of Ed.,* 1977 S.L.D. 388. Participation in sports at public schools is a 'privilege', not a right." *Id.* at 29.

This issue was also addressed by the Honorable Clarkson S. Fisher in *Winfield Brooks v. William Regan,* Civil Action No. 81–3610 (December 2, 1982) (unpublished opinion). Because judges of the same district customarily follow the other's decision, Judge Fisher's analysis should be given serious consideration. *See White v.*

*Baltic Conveyer Company,* 209 F.Supp. 716, 722 (D.N.J.1962).

In *Brooks,* a high school student and starter on his school's football team admitted drinking beer and smoking marijuana in violation of team training rules. Shortly thereafter, he was removed from the team. The student filed suit alleging that he was denied his right to procedural due process because he was dismissed without notice and a pretermination hearing.

Judge Fisher, relying on New Jersey law, found that high school students do not have a property interest in playing football and, therefore, may be dismissed from a team without due process. *Id.* at 5. Specifically, Judge Fisher held:

> As *Roth* indicates, any analysis concerning whether interscholastic athletics are protected should in the first instance be made by reference to state law. 408 U.S. at 577. In *Dennis v. Holmdel Bd. of Ed.,* 1977 School Law Decision 388, New Jersey's Commissioner of Education stated, "participation in interscholastic athletics is a privilege which is subject to rules made by local boards of education". The Third Circuit has also held that a "right" to play basketball did not rise to the level of a specific constitutional guarantee. *Moreland v. Western Pa. Interscholastic, Etc.,* 572 F.2d 121, 122–23 (3d Cir.1978).
>
> Accordingly, since plaintiff Winfield Brooks had no property interest in playing football, this court need not determine if he was dismissed in accordance with due process.

*Id.*

New Jersey is not alone in recognizing that students do not have a federally protected property interest in extracurricular activities. The great majority of state and federal courts which have considered this issue have reached a similar conclusion. *See Hysaw v. Washburn University of Topeka,* —— F.Supp. ——, slip opinion (D. Kansas Dec. 4, 1987); *Haverkamp v. Unified School District,* —— F.Supp. ——, slip opinion (D.Kansas May 20, 1986); *Giannattasio v. Stamford Youth Hockey Ass'n,* 621 F.Supp. 825 (D.Conn.1985); *Davis v.*

*Churchill County School Board of Trustees,* 616 F.Supp. 1310 (D.Nev.1985); *Hardy v. University Interscholastic League,* 759 F.2d 1233 (5th Cir.1985); *Davenport v. Randolph County Board of Education,* 730 F.2d 1395 (11th Cir.1984); *Duffy v. Barrington Community Unit School District No. 220,* slip opinion (N.D.Ill. February 16, 1982); *Rutledge v. Arizona Bd. of Regents,* 660 F.2d 1345 (9th Cir.1981); *Park Hills Music Club v. Board of Ed., Etc.,* 512 F.Supp. 1040 (1981); *Hebert v. Ventetuolo,* 638 F.2d 5 (1st Cir.1981); *Glenn v. Harper,* No. 76–106 (N.D.Ohio, Mar. 17, 1978), aff'd 620 F.2d 302 (6th Cir.1980); *Walsh v. Louisiana High School Athletic Assoc.,* 616 F.2d 152 reh. denied 621 F.2d 440 (5th Cir.1980); *Kite v. Marshall,* 494 F.Supp. 227 (S.D.Texas 1980); *Ward v. Robinson,* 496 F.Supp. 1 (E.D.Tenn.1978); *Hamilton v. Tenn. Secondary School Athletic Ass'n.,* 552 F.2d 681 (6th Cir.1976); *Paschal v. Perdue,* 320 F.Supp. 1274 (S.D.Fla.1970); *Okla High School Athletic Assoc. v. Bray,* 321 F.2d 269 (10th Cir.1963); *Bailey v. Truby,* 321 S.E.2d 302 (W.Va.1984); *Pennsylvania Interscholastic Athletic Association v. Greater Johnstown School District,* 76 Pa. Commw. 65, 71, 463 A.2d 1198, 1201 (1983); *Adamek v. Pennsylvania Interscholastic Athletic Association, Inc.,* 57 Pa.Commw. 261, 262, 426 A.2d 1206, 1207 (1981); *Menke v. Ohio High School Athletic Association,* 2 Ohio App.3d 244, 245, 441 N.E.2d 620, 624 (1981); *Whipple v. Oregon School Activities Association,* 52 Or.App. 419, 423, 629 P.2d 384, 386 (1981); *Caso v. New York State Public High School Athletic Association,* 78 A.D.2d 41, 46, 434 N.Y. S.2d 60, 64 (1980); *Florida High School Activities Association v. Bradshaw,* 369 So.2d 398, 403 (Fla.App.1979); *Kriss v. Brown,* 180 Ind.App. 594, 604, 390 N.E.2d 193, 199–201 (1979); *Smith v. Crim,* 240 Ga. 390, 392, 240 S.E.2d 884, 886 (1977); *Kentucky High School Athletic Association v. Hopkins County Board of Education,* 552 S.W.2d 685, 689 (Ky.App.1977); *NCAA v. Gillard,* 352 So.2d 1072, 1081

(Miss.1977); *Chabert v. Louisiana High School Athletic Association,* 312 So.2d 343, 345 (La.App.1975); *State ex rel. Missouri State High School Activities Association v. Schoenlaub,* 507 S.W.2d 354, 359 (Mo.1974); *Haas v. South Bend Community School Corporation,* 259 Ind. 515, 521, 289 N.E.2d 495, 498 (1972); *Sanders v. Louisiana High School Athletic Association,* 242 So.2d 19, 28 (La.App.1970); *Marino v. Waters,* 220 So.2d 802, 806 (La.App. 1969).

A minority of decisions, however, have held that students have a property interest in extracurricular activities. These cases rest on the premise that extracurricular activities, specifically interscholastic athletics, serve as a springboard to college scholarships and professional opportunities.[8] For example, in *Duffley v. N.H. Interscholastic Athletic Assoc.,* 446 A.2d 462 (N.H. 1982), the New Hampshire Supreme Court, finding a due process right under the State Constitution, held that,

> "It is apparent that interscholastic athletics are considered an integral and important element of the educational process in New Hampshire. It follows that the right to participate in them at least rises above that of a mere privilege. Recognizing this, and the stark fact that a student's ability to attend college and further his education may, in many instances, hinge upon his athletic ability and athletic scholarships we hold that the right of a student to participate in interscholastic athletics is one that is entitled to the protections of procedural due process under Part I, Article 15 of our State Constitution.

*Id.* at 467. *See also, Boyd v. Board of Education of McGehee School District No. 17,* 612 F.Supp. 86, 93 (D.Ark.1985) (a student's participation in interscholastic athletics is important to a student's education and economic development. Thus, the "privilege of participating in interscholastic athletics must be deemed a property inter-

---

**8.** *But see Hawkins v. NCAA,* 652 F.Supp. 602, 611 (C.D.Ill.1987) (a hoped for professional career in athletics is too speculative); *Colorado Seminery v. NCAA,* 417 F.Supp. 885–895 (D.Colo. 1976) ("the interest of future professional ca-

reers must nevertheless be considered speculative and not of constitutional dimensions"). *See also, Parish v. National Collegiate Athletic Association,* 506 F.2d 1028, 1034, n. 17 (5th Cir. 1975).

est protected by the due process of the Fourteenth Amendment.") *Behagan v. Interscollegiate Conference of Faculty Representatives*, 346 F.Supp. 602, 604 (D.Minn. 1972) (participation in athletics has "the potential to bring students great economic rewards").

Another view advanced by one court is to analyze the degree of exclusion from extracurricular activities in determining whether procedural due process is implicated. *Pegram v. Nelson*, 469 F.Supp. 1134, 1140 (M.D.N.C.1979). For example, in *Pegram* the court found that the denial of a student's opportunity to participate in one or several extracurricular activities would not give rise to a right to due process. *Id.* "However, *total exclusion* from participation in that part of the educational process designated as extracurricular activities for a *lengthy period* of time could, depending upon the particular circumstances, be a sufficient deprivation to implicate due process." *Id.* (emphasis in original). In *Pegram*, a four month extracurricular suspension did not constitute a lengthy amount of time. *See also, Dallam v. Cumberland Valley School District*, 391 F.Supp. 358, 361 (M.D.Pa.1975):

> The property interest in education created by the State is participation in the entire process. The myriad activities which combine to form that education process cannot be dissected to create hundreds of separate property rights, each cognizable under the Constitution. Otherwise, removal from a particular class, dismissal from an athletic team, a club or any extracurricular activity would each require ultimate satisfaction of procedural due process.

*Id.* at 361.

Notwithstanding these few cases which hold that a property interest exists because of the potential for future education or professional opportunities or which implicate the due process clause because of the nature and length of the extracurricular suspension, it is clear that this Court must look to *New Jersey* law in determining whether Daniel Palmer had a property interest in participating in extracurricular activities. *Board of Regents v. Roth, supra.*

Here, New Jersey case law, consistent with the majority of state and federal courts, specifically rejects the notion that participation in extracurricular activities is anything but a privilege. *Dennis v. Holmdel Board of Education, supra.* Therefore, Palmer has no property interest in playing varsity football and his suspension from that activity as well as other extracurricular activities, did not have to comport with due process. Thus, it is recommended that summary judgment be entered in favor of defendants on these claims.

### 2. Defendants' Alleged Violation of School Rules—Due Process

■ Plaintiff also alleges that defendants violated his right to due process because the sixty day extracurricular suspension was imposed in violation of school regulations. Essentially plaintiff claims that the school handbook provides *only* for a ten day school suspension for possession of illegal drugs and not for an additional extracurricular suspension. Therefore, defendants' imposition of the latter penalty contradicted their own rules. But defendants argue that Merluzzi's reliance on the "good citizenship" clause was sufficient to suspend Palmer. Moreover, defendants point out that school disciplinary rules need not be as detailed as a criminal code in order for school officials to impose punishment. *See Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986).

This issue is ripe for disposition on a motion for summary judgment. The only material facts are that Palmer's extracurricular suspension was imposed by Merluzzi pursuant to the "good citizenship" clause and that the school handbook made no mention of additional extracurricular suspensions for possession of drugs or paraphernalia. The parties do not dispute these facts. Whether the defendants' conduct violated their own rules, thus implicating Palmer's right to procedural due process, is a question of law.

Whether a school may subject a student to disciplinary sanctions not specifically provided for in the student handbook was recently addressed by the United States Supreme Court in *Bethel School District No. 403 v. Fraser, supra.* In *Bethel,* a student was suspended from school for three days for making certain obscene remarks at a school assembly in violation of school policy. Apparently, while using obscene language was prohibited, the school did not specifically enunciate the penalty that would be imposed. The student claimed the suspension violated due process because he did not know that his conduct could subject him to disciplinary sanctions. The Supreme Court rejected the student's claim as "wholly without merit", 92 L.Ed.2d at 560 and upheld the suspension. The Court based its decision on a school's need for flexibility in school disciplinary procedures in maintaining security and order. *Id., citing New Jersey v. T.L.O.,* 469 U.S. 325, 83 L.Ed.2d 720, 105 S.Ct. 733 (1985). Concerning the lack of proscribed sanctions the Court noted:

> Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, *the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions.* (Emphasis added).

*Bethel School Dist. No. 403, supra* 478 U.S. at 686, 106 S.Ct. at 3166, 92 L.Ed.2d at 560.

*Bethel* supports the view that school officials may discipline students for prohibited conduct notwithstanding the lack of any specific penalty listed in the school handbook, consistent, of course, with the guidelines set forth in *Goss v. Lopez, supra.* In the instant case, defendants' extracuricular suspension of Palmer, although not provided for in the high school handbook, is consistent with this decision. *See also Dunn v. Tyler Independent School District,* 460 F.2d 137, 142 (5th Cir.1972) ("the conduct of school affairs by those charged with it, and the duties and responsibilities of students, are not necessarily wholly encased in written regulations").

Palmer argues, however, that the defendants by only providing for a ten day suspension in the school handbook did not permit additional discretionary sanctions. Therefore, Palmer claims that the imposition of the extracurricular suspension circumvented defendants' own rules and thus violated due process.

The United States Supreme Court has recognized that "[w]here the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures. This is so even where the internal procedures are possibly more rigorous than otherwise would be required", *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270, *quoted in United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). However, an agency's failure to follow its own rules is not a *per se* violation of due process. *United States v. Caceres, supra.* See also, *Morris v. City of Danville,* 744 F.2d 1041, 1049 (4th Cir.1984); *Detweiler v. Commonwealth of Virginia Department of Rehabilitative Services,* 705 F.2d 557, 561 (4th Cir.1983); *Woodard v. Los Fresnos Independent School District,* 732 F.2d 1243, 1245 (5th Cir.1984); *Smith v. Georgia,* 684 F.2d 729, 732 n. 6 (11th Cir.1982); *Brandywine Affiliate NCCEA/DSEA v. Board of Education of the Brandywine School District,* 555 F.Supp. 852, 864 (D.Del.1983). Rather, the due process clause is only implicated when an agency violates regulations "mandated by the Constitution or federal law", *U.S. v. Caceres, supra,* or when "an individual has reasonably relied on agency regulations promulgated for his guidance or benefit and has suffered substantially because of their violation by the agency." *Id.* Even when the due process clause is implicated, the Third Circuit has held that the proper remedy is invalidation of the agency action and not, presumably, the monetary damages Palmer is seeking. *Lojeski v. Boandl,* 788 F.2d 196, 199 (3d Cir.1986) ("these cases provide ample guidance to courts asked to reverse 'tainted' agency actions, but do not enunciate constitutional principles to take the courts beyond the realm of administrative law").

Here, it is evident that neither the Constitution nor federal law governs school regulations concerning extracurricular suspensions. Therefore, Palmer must show that he reasonably relied on the student handbook's silence concerning extracurricular suspensions and that his subsequent suspension both violated school rules and caused him to suffer substantially. *U.S. v. Caceres, supra.* Essentially, Palmer must demonstrate that when he decided to drink beer and smoke marijuana on school property he reasonably relied on school regulations which stated that if apprehended he would only be subject to a ten day school suspension and possible criminal prosecution. Thus, for Palmer to meet the first prong of the *Caceres* reasonable reliance test, he must show that he would *not* have smoked marijuana on school property if he knew that he might be suspended from the football team for more than ten days. This claim is wholly without merit. By engaging in prohibited conduct Palmer undoubtedly knew that, if caught, he could be suspended from school and might face criminal prosecution. To assert that he would willingly risk those sanctions but not a suspension from the football team for more than ten days is not credible.

In conclusion, Palmer has failed to demonstrate that defendants either violated school regulations or that he reasonably relied on the school handbook before drinking beer and smoking marijuana on school property. Therefore, I recommend that Palmer's due process claims be dismissed with prejudice.

### 3. *Liberty Interest*

Next, I will consider whether Palmer's claim that his liberty interests in his "good name, reputation, honor or integrity", *Board of Regents v. Roth, supra* 408 U.S. at 573, 92 S.Ct. at 2707, were impaired because a description of the incident imposed allegedly became part of his permanent record. Palmer argues that because he was not granted a hearing to explain mitigating circumstances his file will not reflect "what really happened". According to Palmer, these files are available for review by employers and college admissions officers and will, presumably prejudice his attempts to receive a college education or obtain employment.

The liberty interests protected by procedural due process are broad in scope. *Robb v. City of Philadelphia,* 733 F.2d 286, 293 (3d Cir.1984). "[Liberty] denotes not merely freedeom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized ... as essential to the orderly pursuit of happiness by free men" *Id., quoting Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042, 1045.

An individual also has a liberty interest in his "good name, reputation, honor or integrity", *Board of Regents v. Roth, supra.* However, stigma to reputation alone, without an accompanying loss of present or future employment is not a protected interest. *Robb v. City of Philadelphia, supra, citing Paul v. Davis,* 424 U.S. 693, 701–06, 96 S.Ct. 1155, 1160–63, 47 L.Ed.2d 405 (1976). Importantly, "critical comments contained in confidential personnel files, not subject to public disclosure cannot infringe an individual's liberty interest." *Hewitt v. Grabicki,* 794 F.2d 1373, 1380 (9th Cir.1986). *See also, Debose v. U.S. Department of Agriculture,* 700 F.2d 1262, 1266 (9th Cir.1983); *Ortwein v. Mackey,* 511 F.2d 696, 699 (5th Cir.1975).

Here, Palmer *admitted* drinking beer and smoking marijuana in violation of school rules and was ultimately suspended from participating in extracurricular activities for sixty days. Assuming that school personnel files reflect this incident, Palmer's reputation was not harmed by the defendants' failure to provide a hearing but rather by his own conduct. This is not a situation where school officials suspended a student based on *allegations* without due process and subsequently entered this in a file. Rather, Palmer *admitted* his participation and presumably this admission and his suspension are reflected in his file.

These facts do not give rise to a liberty interest. *Hewitt v. Grabicki, supra.* Moreover, Palmer has not alleged that the *conduct of the defendants* caused him a deprivation of present or future employment or educational opportunities. *Robb v. City of Philadelphia, supra.* Because I find that Palmer could not demonstrate that defendants infringed a protected liberty interest it is not necessary to consider what process he was due. *Morrisey v. Brewer, supra.* Therefore, I recommend that Palmer's due process claims be dismissed.

## EQUAL PROTECTION

■ Palmer claims that his suspension from extracurricular activities violated his right to equal protection. Essentially, Palmer argues that no other student has ever received a penalty of this magnitude and the penalty [9] is not rationally related to a legitimate governmental objective.

The Fourteenth Amendment to the United States Constitution provides in pertinent part:

"No state shall ... deny to any person within its jurisdiction the equal protection of the laws."

In analyzing an equal protection claim a court must first determine what standard of review to employ. The first standard, strict scrutiny, should be used in cases involving 1) a government act classifying people in terms of their ability to exercise a fundamental right or 2) a governmental classification that distinguishes between persons in terms of any right, upon some suspect basis. *Hawkins v. National Collegiate Athletic Assoc.,* 652 F.Supp. 602, 613 (C.D.Ill.1987) *citing U.S. v. Carolene Products Company,* 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 783 n. 4 82 L.Ed. 1234 (1938). The second standard, the rational relationship test, mandates that "classifications that neither regulate suspect classes nor burden fundamental rights be sustained if they are rationally related to a legitimate

governmental interest." *In re Asbestos Litigation,* 829 F.2d 1233, 1238 (3d Cir. 1987).

It is well settled law that a right to a public education is not a fundamental right under the federal constitution.[10] *Plyer v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed. 2d 786 rehearing denied 458 U.S. 1131, 103 S.Ct. 14, 73 L.Ed.2d 1401 (1982); *Texas v. Certain Named and Unnamed Undocumented Alien Children,* 454 U.S. 1077, 102 S.Ct. 629, 70 L.Ed.2d 611 (1981) rehearing denied 458 U.S. 1131, 103 S.Ct. 14, 73 L.Ed.2d 1401 (1982). Therefore, the more remote "right" to participate in extracurricular activities does not rise to a fundamental right of constitutional dimension. *Hawkins v. National Collegiate Athletic Association, supra; Walsh v. Louisiana High School Athletic Assoc., supra. Blue v. University Interscholastic League,* 503 F.Supp. 1030, 1035 (N.D.Texas 1980); *Kulovitz v. Illinois High School Assoc.,* 462 F.Supp. 875, 878 (N.D.Ill.1978). Additionally, the extracurricular suspension was not based on a suspect classification. *Brands v. Sheldon Community School,* 671 F.Supp. 627, 630 (N.D.Iowa 1987). *See Blue v. University Interscholastic League, supra; Kulovitz v. Illinois High School Assoc., supra.* Because neither a fundamental right nor a suspect class is involved here the defendants' conduct must be analyzed under the rational relationship test.

Under this test, I must determine whether the extracurricular suspension of Daniel Palmer was "rationally related to a legitimate governmental interest." *In re Asbestos Litigation, supra.* The defendants' articulated interest in suspending Palmer was to ensure that only students who display "good citizenship and responsibility" may participate in interscholastic sports and to see "a change in attitude from an individual involved with drugs or alcohol." (T-124)

**9.** Palmer has cross-moved to discover all disciplinary records and files for any offense involving the use of drugs and/or alcohol for the last five years. This discovery is unnecessary for

the reasons discussed herein, and the motion will be denied.

**10.** Plaintiff makes no claim under the New Jersey State Constitution.

In analyzing whether Palmer's extracurricular suspension was rationally related to a legitimate governmental interest it is essential to keep in mind the relationship between federal courts and decisions made by local school boards. The United States Supreme Court recognizes that "the education of the nation's youth is primarily the responsibility of parents, teachers, and state and local school officials and not of federal judges" *Hazelwood School District v. Kuhlmeier,* — U.S. —, —, 108 S.Ct. 562, 571, 98 L.Ed.2d 592, 607 (1988). Thus, "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as *lacking a basis in wisdom or compassion.*" *Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 1003, 43 L.Ed.2d 214 (1975) (emphasis added). Additionally, the fifth circuit has recently stated that:

> Federal courts are not super referees over high school athletic programs: Questions about eligibility for competition may loom large in the eyes of youths, and even their parents. We do not disparage their interest in concluding, as here, that these isues are not of constitutional magnitude. Behind this observation rest important values of federalism and the reality that the mighty force of the constitutional commands ought not to be so trivialized.

*Hardy v. University Interscholastic League,* 759 F.2d 1233, 1235 (5th Cir.1985).

Keeping in mind the Supreme Court's reluctance to have federal courts "second guess" policy decisions, I find that Palmer's suspension was rationally related to enforcing the legitimate goal of ensuring compliance with school drug policy. Super-intendent Merluzzi consulted with faculty members, drug rehabilitation programs and school policies regarding drug/alcohol abuse before imposing the suspension. While the penalty was severe, it reflected an approach to deal with a complex social program that I cannot find irrational.[11] *See New Jersey v. T.L.O., supra* ("maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures....").

Palmer's argument that defendant's conduct was arbitrary and capricious because his punishment was more severe than other students violating school policy is similarly without merit. This very argument was recently considered and rejected in *Brands v. Sheldon Community School, supra,* 671 F.Supp. 627. In *Brands,* a member of the high school wrestling team and three other students engaged in multiple acts of sexual intercourse with a sixteen year old female student. The participants were all suspended from extracurricular activities because their conduct was "detrimental to the best interest of the Sheldon Community School District." 671 F.Supp. at 629.

The student-wrestler brought suit in federal court alleging "that he should not have been given a penalty more severe than penalties given in the past to other students for conduct that [he] considers more serious than his own" *Id.* at 633. The district court disagreed holding that:

> "The record adequately demonstrates that the school's treatment of those students involved to the same degree in this incident could hardly have been more consistent; even the female involved was suspended from extracurricular activi-

---

11. While I find that defendants' conduct passes the rational relationship test, I must add that this finding does not signify support by this Court of the length of suspension or the manner in which it was determined. Suspending a student from extracurricular activities for sixty days ostensibly to correct a drug/alcohol program without 1) reading the student's personnel file, 2) determining that a substance abuse problem in fact exists and, 3) ensuring that counseling is available to students who require it raises serious doubts about the corrective value of the punishment. Nevertheless, "[e]qual protection does not free those [such as Palmer] who made assessment of risks or a bad choice from the consequences of their decision", *Corbitt v. New Jersey,* 439 U.S. 212, 226, 99 S.Ct. 492, 501, 58 L.Ed.2d 466 (1978).

Apparently, the defendants have now incorporated several new provisions in their student handbook which deal with counselling for drug/alcohol abusers and explicitly provide for a sixty day extracurricular suspension for a student's first drug/alcohol offense. While these new provisions obviously are an improvement in clarity over the previous handbook they do not affect my analysis in this case.

ties. To go further and evaluate the Board's 'consistency' across different times and different factual settings would require the court to substitute its judgment concerning the relative seriousness of different acts for that of the School Board; the 'arbitrary or capricious' standard of review is too narrow to authorize this kind of analysis."

*Id. citing Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

I agree with this analysis. All students involved in the incident at the radio station, including Palmer, received the same punishment. To go back and view the penalties meted out to others for similar offenses would constitute an unnecessary foray into second guessing the judgment of the Board in many different situations. That is simply unwarranted.

In conclusion, because Palmer has not demonstrated an equal protection violation, nor could he do so even with further discovery, I recommend that his equal protection claim be dismissed with prejudice.

### 4. *42 U.S.C. § 1983*

█ Interspersed throughout Palmer's complaint are claimed violations of 42 U.S.C. § 1983. Generally, to state a claim for relief under section 1983, Palmer must allege 1) that the defendants acted "under color of state law" and 2) that the defendants deprived him of rights, privileges, or immunities secured by the Constitution or the laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981). A student's § 1983 claim against school officials can survive only if his underlying constitutional rights are abridged. *Wood v. Strickland, supra*. In *Strickland*, the United States Supreme Court *citing Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968), recognized:

"§ 1983 does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings or the proper construction of school regulations. The system of public education that has evolved in this nation relies necessarily upon the discretion and judgment of school administrators and school board members, and *§ 1983 was not intended to be a vehicle for federal court correction of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees.* (emphasis added).

*Id.* ·

Here, because I have recommended that Palmer's federal constitutional claims be dismissed with prejudice it is clear that his § 1983 claim must also be dismissed. Therefore, I recommend that Palmer's § 1983 claim be dismissed with prejudice.

### 5. *State Law Claims—Pendent Jurisdiction*

█ At this juncture, I have recommended that all of Palmer's constitutional claims be dismissed with prejudice—only his tort complaints alleged in Counts Five [12] and Six [13] of his complaint remain. Therefore, the court must determine whether it is appropriate to exercise pendent jurisdiction over these remaining state claims.

Before a court should exercise pendent jurisdiction two requirements must be satisfied. "First the underlying federal claims must be sufficiently substantial to support federal jurisdiction and second, the state and federal claims must derive from a common nucleus of operative fact or be such that a plaintiff would ordinarily be expected to try them all in one proceeding." *Martin v. Delaware Law School of Widener University*, 625 F.Supp. 1288, 1299 (D.Del.1985), *citing United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725–27, 86 S.Ct. 1130, 1138–39, 16 L.Ed.2d 218 (1966). In this district, questions of pendent jurisdiction are determined on a case by case basis and are addressed to the

---

**12.** In Count five of his complaint Palmer alleged that defendants "negligently and intentionally interfered with plaintiff's prospective economic advantage".

**13.** In Count six of his complaint Palmer alleged that defendants "negligently and intentionally implicated emotional distress upon the plaintiffs".

sound discretion of the court. *Guyette v. Stauffer Chemical Co.*, 518 F.Supp. 521, 524 (D.N.J.1981). Factors which a court should weigh in determining whether to assume pendent jurisdiction over state claims include judicial economy and convenience, fairness to parties, and degree of uncertainty in relevant state law. *Independent Bankers Association of New York State v. Marine Midland Bank*, 757 F.2d 453 (2d Cir.1985) cert. denied 476 U.S. 1186, 106 S.Ct. 2926, 91 L.Ed.2d 554 (1986).

Normally, "when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Carnegie–Mellon University v. Cohill*, —— U.S. ——, —— —— ——, 108 S.Ct. 614, 618–19, 98 L.Ed.2d 720, 98 L.Ed.2d 720, 729–30 (1988); *See also, Mine Workers v. Gibbs*, 383 U.S. at 726–27, 86 S.Ct. at 1139. While this is not a mandatory rule, "the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Id.* —— U.S. at ——, 108 S.Ct. at 619, n. 7 98 L.Ed.2d at 730, n. 7. *See also, Rosado v. Wyman*, 397 U.S. 397, 403–05, 90 S.Ct. 1207, 1213–14, 25 L.Ed.2d 442 (1970).

Here, considering the aforementioned factors, I recommend that the court decline to exercise pendent jurisdiction over Palmer's state law claims. Little or no discovery has been taken of these claims nor were they briefed or addressed at oral argument by either party. Palmer may adequately pursue these tort claims in state court. *See also Cole v. Pathmark of Fairlawn*, 672 F.Supp. 796 (D.N.J.1987); *Anisfeld v. Cantor Fitgerel & Co., Inc.*, 631 F.Supp. 1461 (S.D.N.Y.1986). Therefore, it is recommended that Counts Five and Six of Palmers complaint be dismissed without prejudice.

In conclusion, I recommend that Palmer's due process and equal protection claims alleged in Counts One through Four of his complaint be dismissed with prejudice. I also recommend that his state tort claims alleged in Counts Five and Six of his complaint be dismissed without prejudice.

Dated: April 12, 1988.