Chester Lawrence PEGRAM, Jr., Chester Lawrence Pegram, Plaintiffs,

v.

Ralph R. NELSON, E. P. Pearce, Jr., Howard E. Carr, James P. Miller, H. Vance Pegram, Walter L. Salmon, Jr., Franklin J. Teague, Guilford County Board of Education, Defendants.

No. C–77–359–G.

United States District Court,
M. D. North Carolina,
Greensboro Division.

April 13, 1979.

Judith G. Behar, Cooperating Atty., for North Carolina Civil Liberties Union, and Anne R. Littlejohn, Greensboro, N. C., for plaintiffs.

Suzanne Reynolds, J. Donald Cowan, Jr., McNeill Smith of Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., John W. Hardy of Douglas, Ravenel, Hardy, Crihfield & Bullock, Greensboro, N. C., for defendants.

Elizabeth C. Bunting, North Carolina Dept. of Justice, Raleigh, N. C., for amicus curiae.

## MEMORANDUM OPINION

HIRAM H. WARD, District Judge.

This matter came on for hearing before the Court upon cross-motions by plaintiffs

and defendants for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure.

The plaintiff, Chester Lawrence Pegram, Jr.,[1] alleges he was deprived of his Fourteenth Amendment right to procedural due process because of the disciplinary actions taken against him by defendant Ralph R. Nelson, Principal of Northeast Junior High School. Plaintiff further alleges that N.C. Gen.Stat. § 115–147 is unconstitutional and that the Guilford County School Discipline Policy is unconstitutional as it relates to student suspensions of ten days or less.

In 1976, disciplinary procedures of the Guilford County public schools were contained in an Information Bulletin entitled "Discipline Policy and Access to Student Records." The plaintiff had received a copy of this Information Bulletin prior to the time of the incident which resulted in his suspension.

The Discipline Policy contained, *inter alia*, the following with regard to suspensions of up to ten days:

> In dealing with alleged misconduct, the principal shall make a reasonable investigation of the facts and circumstances surrounding the incident. The student shall be encouraged to raise any defense he thinks relevant. If the student requests that other witnesses be questioned, the principal should talk to them if possible. If the student makes a reasonable claim of other defensive matter that, if true, would free him from blame but is not immediately available, the principal should postpone disciplinary action for a reasonable time until such evidence can be presented to him.

> . . . . .

> If the principal investigates a student's alleged misconduct and decides to take disciplinary action, he must investigate and take action on all alleged misconduct known to him at that time. Consequently the most serious action he can take on his own authority for any and all misconduct by a particular student known to him at any one time, is to give the student a ten (10) day suspension. If the principal thinks that additional penalties are appropriate, he may seek the Superintendent's approval to initiate the procedure for obtaining a long term suspension or expulsion.

> . . . . .

> A short term suspension is a suspension of a student from school attendance and all other school functions for any period of time up to ten (10) days. The principal may invoke a short term suspension only after investigating the misconduct. . .

A school principal is given the power to suspend a student by N.C.Gen.Stat. § 115–147, which provides in part that "[t]he principal . . . shall have authority to suspend or dismiss any pupil who willfully and persistently violates the rules of the school or who may be guilty of immoral or disreputable conduct, or who may be a menace to the school . . .."

On Monday evening, January 26, 1976, Alvin Long, Wayne Botts, and the plaintiff attended a basketball game at their school, Northeast Junior High, in Greensboro, North Carolina. The plaintiff was fourteen years old and in the ninth grade. Mrs. Jean Trantham was also present at the game and while there discovered that her billfold, which contained about $65, had been stolen. She informed defendant Nelson, the principal, about the theft and that three boys, including plaintiff, had been sitting behind her. She explained that the boys had left the gymnasium just before she noticed her billfold missing. The gatekeeper, Mr. Sechrest, told Nelson that he had seen the boys leave the building.

Nelson observed Long, Botts, and Pegram walking together away from the school.

---

1. On the same day that the complaint was filed, an order was entered appointing minor Chester Pegram, Jr.'s father as his next friend for the purpose of bringing this action. Technically, therefore, there are two plaintiffs. However, the Court will refer to the minor son, Chester Pegram, Jr., as the plaintiff or Pegram, and will refer to Chester Pegram, Sr., as "plaintiff's father."

When he yelled for the three to stop, one of them put his hands down the front of his pants. The boys returned with the principal to his office. A search of Long and Botts by Nelson revealed $20 on one boy and $22 on the other. No money was found on Pegram. The plaintiff believed that he had been searched because he was suspected of taking part in the theft.

Nelson directed plaintiff to accompany him to retrace the steps that the three students had taken that evening. Trantham's billfold was found in the boys' bathroom. The principal and Pegram returned to the office and discussed the matter further. Plaintiff was confronted with written statements made by Long and Botts accusing him of stealing the money, but he denied having taken part in the theft.

Nelson, of his own accord, telephoned plaintiff's father. After the father arrived at the office, the principal discussed the incident with him in the presence of plaintiff and the gatekeeper. Nelson told him that Long, Botts, and his son were suspected of having taken money from Trantham's pocketbook, and that Long and Botts had made written statements accusing plaintiff of taking the money. Pegram did not at this time give Nelson any names of persons who could support his denial or who had knowledge of the incident.

According to the plaintiff, he was told on the following day at school that he would be suspended, beginning January 29, for ten school days, and that he would not be allowed on school grounds after 3:15 p. m. for the rest of the school year. Plaintiff's parents received a letter from Nelson, dated January 28, 1976, informing them that:

. . . your son is suspended from Northeast Junior High School for ten school days, starting on January 29, 1976. He may return to school on Thursday, February 12, 1976.

Also, Lawrence is not to be on the Northeast Junior High School grounds except during regular school hours. He may not attend any after school activities. This is to be for the remainder of the 1975–76 school year.[2]

Pegram's father called Nelson after receiving the letter and discussed the incident further.

On Friday, January 30, 1976, Nelson talked with plaintiff's father in his office.[3] At that meeting, the father offered names of four students who might have evidence bearing on the incident. Nelson agreed to talk with these four persons, but declined to do so in the presence of plaintiff's father. After talking to the students, the principal apprised the father that the information obtained from them did not alter his findings.

The only time that plaintiff asked the principal if he could attend an after-school extracurricular function, the prom in May of 1976, Nelson conditioned his assent upon receipt of notes from plaintiff's teachers that he was making passing marks. As soon as plaintiff presented Nelson with the requested notes, he was allowed to attend the prom. The only other extracurricular activity in which plaintiff expressed an interest was track.[4] He did not, however, ask the principal whether he could participate in track.[5]

The plaintiff filed a complaint on July 27, 1977, against principal Nelson, E.P. Pearce, Jr., superintendent of schools, and the members of the Guilford County Board of Education. The attorney general of North Carolina has been allowed to appear as amicus

---

2. The same disciplinary measures were taken against Long and Botts.

3. Plaintiff's father had obtained counsel by January 29, 1976. The attorney scheduled the January 30 meeting between the father and Nelson.

4. Plaintiff stated in an affidavit that "[i]n the past, I had gone out for football and track." There was no evidence indicating that the foot-

ball season was still in progress during the prohibition against after-school extracurricular activities.

5. Plaintiff's father stated in his deposition that his son "wanted to go out for track and he felt that he shouldn't ask. He felt that they wouldn't let him and he didn't ask." Deposition of Chester Lawrence Pegram, Sr., at 8.

curiae. The plaintiff and the defendants have now moved for summary judgment.

■ *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), is the leading case on the applicability of due process to student discipline. There, the Supreme Court held 'that where a student has a "legitimate entitlement to a public education,"[6] such entitlement constituted "a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause." *Goss,* 419 U.S. at 574, 95 S.Ct. at 736. Additionally, it was noted that when a student's suspension is based on charges of misconduct, a liberty interest in reputation is implicated.[7]

Having found property and liberty interests, the Court announced that:

> due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. *Goss,* 419 U.S. at 581, 95 S.Ct. at 740.

The Court emphasized that the required hearing could be informal:

> [T]he disciplinarian may *informally* discuss the alleged misconduct with the student minutes after it has occurred. We hold only that, *in being given an opportunity to explain his version* of the facts at this discussion, the student *first be told what he is accused of doing and what the basis of the accusation is.*

> . . . . .

> We stop short of construing the Due Process Clause to require . . . that

hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident. *Goss,* 419 U.S. at 582, 583, 95 S.Ct. at 740 (emphasis added).[8]

An informal hearing is thus permissible when a student is given a short suspension. The Supreme Court addressed itself solely to the short suspension not exceeding ten days, and warned that "suspensions [longer than ten days] or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Goss,* 419 U.S. at 584, 95 S.Ct. at 741.

■ Students in North Carolina have legitimate claims of entitlement to a public education. By law, a uniform system of free public schools is provided throughout the state, N.C.Gen.Stat. § 115–1, and students are required to attend. N.C.Gen.Stat. § 115–166. Therefore, the plaintiff had a property interest in public education, *see* note 6 *supra,* and was entitled to due process in connection with the ten-day suspension.

■ If the principal had given plaintiff only a ten-day suspension, there would be no doubt that the requisite due process had been provided. On the day of the incident, the principal told plaintiff what he was accused of doing and showed him the evidence against him. The plaintiff denied that he had participated in the theft, and he was given an opportunity to respond and explain his version of the incident. Furthermore, the principal phoned plaintiff's father to come to the school. The plaintiff, his father, and the principal discussed the

**6.** The Court found that Ohio students had legitimate claims of entitlement to a public education because state statutes required local authorities to provide a free secondary education and they required students to attend. *Goss,* 419 U.S. at 573, 95 S.Ct. at 735.

**7.** The Court explained that charges of misconduct "could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportu-

nities for higher education and employment." *Goss,* 419 U.S. at 575, 95 S.Ct. at 736. *See Paul v. Davis,* 424 U.S. 693, 710, 96 S.Ct. 1155, 47 L.Ed.2d 405, 419 (1976).

**8.** Later in the opinion, the Court again referred to "an informal give-and-take between student and disciplinarian." *Goss,* 419 U.S. at 584, 95 S.Ct. at 741. *See Board of Curators of University of Missouri v. Horowitz,* 435 U.S. 78, 86, 98 S.Ct. 948, 55 L.Ed.2d 124, 132 (1978).

incident, with the principal again explaining the accusation and exhibiting the written statements of Long and Botts. Plaintiff again had an opportunity to explain his side. Several days later plaintiff's father gave the principal the names of possible witnesses,[9] and Nelson talked to each of these persons. The procedures followed by the principal were fully in accord with *Goss. See Graham v. Board of Education, Idabel School District Number Five*, 419 F.Supp. 1214 (E.D.Okla.1976); *Coffman v. Kuehler*, 409 F.Supp. 546 (N.D.Tex.1976).

The plaintiff, however, was given another penalty in addition to a ten-day suspension: he was not to be on school grounds after regular school hours and accordingly was not to attend any after-school activities. This prohibition was for four months, the remainder of the 1975–76 school year. This Court must decide whether such prohibition required greater due process than that afforded plaintiff.

 The opportunity to participate in extracurricular activities is not, by and in itself, a property interest. Property interests are defined by state law, *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684, 690 (1976), and this Court is unaware of any North Carolina statute or law which creates a right to participate in extracurricular activities.[10] *Cf. Smith v. Crim*, 240 Ga. 390, 240 S.E.2d 884 (1977) (interpreting Georgia law); *State v. Lawrence Circuit Court*, 240 Ind. 114, 162 N.E.2d 250 (1959) (interpreting Indiana law). Without possessing a property interest in extracurricular activities, plaintiff would not be entitled to procedural due process.

**9.** This occurred on the second day of the suspension. However, plaintiff could have given the principal the names on the day of the incident. The timing of the disclosure was dependent upon plaintiff.

**10.** Courts have occasionally addressed the issue of a student's interest in participation in one type of extracurricular activity—sports. Most cases have held that participation in interscholastic sports does not constitute a property interest. *See, e. g., Colorado Seminary v. N. C. A. A.*, 570 F.2d 320 (10th Cir. 1978); *Mitchell v. Louisiana High School Athletic As-*

 If the plaintiff's property interest in public education, *see* page 1138 *supra*, is considered to extend to the total "educational process,"[11] then, under certain circumstances, the need for some due process might arguably arise where a student is excluded from participation in extracurricular activities. This is because participation in extracurricular activities can be considered part of the total educational process. It has been recognized that "[t]he educational process . . . is not limited to classroom attendance but includes innumerable separate components, such as participation in athletic activity and membership in school clubs and social groups . . . ." *Albach v. Odle*, 531 F.2d 983, 985 (10th Cir. 1976). However, *Goss* should not be read to establish a property interest subject to constitutional protection in each of these separate components. *Albach v. Odle*, 531 F.2d at 985. *See also Colorado Seminary v. N. C. A. A.*, 570 F.2d 320, 321 (10th Cir. 1978). As noted by the Court in *Dallam v. Cumberland Valley School District*, 391 F.Supp. 358, 361 (M.D.Pa.1975):

> [T]he property interest in education created by the state is participation in the entire process. The *myriad activities* which combine to form that educational process *cannot be dissected to create hundreds of separate property rights*, each cognizable under the Constitution. Otherwise, removal from a particular class, dismissal from an athletic team, a club or any extracurricular activity, would each require ultimate satisfaction of procedural due process.

(emphasis added).

*sociation*, 430 F.2d 1155 (5th Cir. 1970); *Dallam v. Cumberland Valley School District*, 391 F.Supp. 358 (M.D.Pa.1975); *Taylor v. Alabama High School Athletic Association*, 336 F.Supp. 54 (M.D.Ala.1972). *See also Denis J. O'Connell High School v. Virginia High School League*, 581 F.2d 81, 84 (4th Cir. 1978).

**11.** The Supreme Court in *Goss* used the term "educational process," although not specifically in the context of finding a property interest. 419 U.S. at 576, 95 S.Ct. 729.

Since there is not a property interest in each separate component of the "educational process," denial of the opportunity to participate in merely one or several extracurricular activities would not give rise to a right to due process.[12] However, *total exclusion* from participation in that part of the educational process designated as extracurricular activities for a *lengthy period of time* could, depending upon the particular circumstances, be a sufficient deprivation to implicate due process.

■ The plaintiff in the present case was *not* precluded from participating in *all* extracurricular activities, but only those occurring after school for a period of four months.[13] This Court need not decide, however, whether the plaintiff had a right to procedural due process under these facts, for assuming that he did have such a right, he was afforded all the process that he was due.

The Supreme Court has identified three factors which should be considered in determining the specific dictates of due process:

[F]irst, *the private interest* that will be affected by the official action; second, the *risk of an erroneous deprivation of such interest* through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the *Government's interest*, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335, 96

S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976) (emphasis added).

The private interest that was affected[14] in the instant case was not one of great magnitude, but was simply the interest in after-school extracurricular activities.[15] There may have been some risk of an erroneous deprivation of such interest through the procedures the principal used, although this is inherent in any fact finding endeavor. Furthermore, the plaintiff was aware of the specific charges and evidence against him, and had the opportunity (as did his father) to explain his version of the facts. The school certainly has an interest in preventing acts such as theft from occurring at extracurricular activities on school grounds. Finally, the additional cost and administrative burden on schools to hold formal full-scale hearings must be considered. Weighing all of these factors, the Court concludes that for a student who is given a four-month prohibition against participation in all after-school extracurricular activities, the process due,[16] is the informal procedures announced in *Goss*: notice of the accusation and evidence against the accused, and an opportunity for the accused to explain his version of the facts. *Cf. Whiteside v. Kay*, 446 F.Supp. 716, 720 (W.D.La.1978). Pegram was accorded these informal procedures by the principal.

The Court does not believe that greater due process procedures were required merely because the extracurricular activity prohibition was imposed in conjunction with a ten-day suspension. "[T]he interpretation

---

**12.** The Court envisions that most deprivations of the opportunity to participate in various extracurricular activities for a limited length of time would, even if they should implicate a property interest in the educational process, be *de minimus* and thus not deserving of due process protection.

**13.** No evidence was presented as to how many or what kind of extracurricular activities took place after school.

**14.** The Supreme Court recognized in *Goss* that the severity of a deprivation is a "factor to weigh in determining the appropriate form of hearing . . . ." 419 U.S. at 576, 95 S.Ct. at 737. *See also Fuentes v. Shevin*, 407 U.S. 67,

90 n.21, 92 S.Ct. 1983, 32 L.Ed.2d 556, 575 n.21 (1972).

**15.** Certainly the interest in extracurricular activities is not as great as the interest in curricular activities. As one court has so aptly explained, "[s]chools are for education. There is no doubt that extracurricular athletic competition may add to the educational process, but the extracurricular activities should not take precedence over the curricular activities of the school. *The sideshow may not consume the circus.*" *Sturrup v. Mahan*, 290 N.E.2d 64, 68 (Ind.App.1972) (emphasis added).

**16.** Assuming that the student has a right to due process.

and application of the Due Process Clause are intensely practical matters and . . '[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'" *Goss,* 419 U.S. at 578, 95 S.Ct. at 738. This Court holds that, under all of the circumstances of the present case, the principal's actions in disciplining plaintiff comported with the minimum standards required by the Due Process Clause, and more formal procedures were not required.

Plaintiff argues that a strong liberty interest was implicated due to the seriousness of the charge of misconduct (theft) and thus greater due process was mandated. The Court must reject such argument. Some of the students in *Goss* were accused of misconduct of a more serious nature: assault on a police officer and destruction of property. 419 U.S. at 570, 95 S.Ct. 729. However, even with these serious charges, the Supreme Court required only an informal hearing. There are no special circumstances present in the instant case to justify a departure from *Goss.*

■ The Court wishes to emphasize that in school discipline cases, "[i]t is not [its] function . . . to sit as a reviewing court with respect to if or when or what disciplinary sanctions should be imposed on students . . . ." *Graham v. Board of Education, Idabel School District Number Five,* 419 F.Supp. 1214, 1218 19 (E.D.Okla. 1976). This Court does not intend to become a judicial school administrator-of-last-resort. The United States Supreme Court has recognized that:

> [i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion. . . [42 U.S.C.] § 1983 does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings . . . . The system of public education that has evolved in this Nation relies necessarily upon the

discretion and judgment of school administrators and school board members, and § 1983 was not intended to be a vehicle for federal court correction of errors in the exercise of that discretion which do not rise to the level of violations of specific constitutional guarantees. *Wood v. Strickland,* 420 U.S. 308, 326, 95 S.Ct. 992, 1003, 43 L.Ed.2d 214, 227–28 (1975).

The Court notes, however, that the principal in the instant case was justified in concluding that the plaintiff was involved. in the theft, in light of the evidence he had before him, and his decision was not arbitrary or capricious. Furthermore, the prohibition against participation in after-school extracurricular activities was not divorced from reason, considering that the theft occurred at an after-school activity.

■ The plaintiff attacks the written "Discipline Policy" of the Guilford County schools contained in an Information Bulletin as it applies to suspensions of not more than ten days. The Court finds that the policy complies with the due process requisites mandated by the Supreme Court in *Goss.* The "Discipline Policy" requires the principal to make an investigation of the facts and circumstances surrounding the alleged misconduct and to allow the accused student to raise any defense.[17] This policy rule is apparently similar to the one approved by the Supreme Court in *Goss,* wherein it was noted that "according to the most recent memorandum [of the school district involved in the case] . . . .; school principals in the [district] . . . are now required by local rule to provide at least as much [due process] as the constitutional minimum which we have described." 419 U.S. at 583, 95 S.Ct. at 740. The "recent memorandum" mentioned by the Court:

> place[d] upon the principal the obligation to "investigate" "before commencing suspension procedures"; and provide[d] as part of the procedures that the principal shall discuss the case with the pupil, so

---

17. The Court reads the Policy as requiring the principal to inform the student what he is accused of doing and the basis for the accusation.

that the pupil may "be heard with respect to the alleged offense" . . .. 419 U.S. at 568 n. 1, 95 S.Ct. at 733 n. 1.

■ The plaintiff also attacks N.C.Gen. Stat. § 115–147 as unconstitutional. This statute provides that a school principal shall have the authority to suspend or dismiss a student, but it does not contain any specific procedures for a principal to follow. However, there is no need to hold the statute unconstitutional. Regulations concerning student discipline were adopted by the Guilford County school board and were to be followed in cases where a principal exercises his authority under N.C.Gen.Stat. § 115–147. These regulations were followed by Nelson in the present case, and this Court has held the regulations to be constitutionally adequate. There is no need to hold a state statute unconstitutional where regulations and actual procedures followed by school officials comport with due process. *See Graham v. Board of Education, Idabel School District Number Five*, 419 F.Supp. 1214, 1220–21 (E.D.Okla.1976). *Cf. Webster v. Perry*, 367 F.Supp. 666, 668 (M.D.N.C. 1973), *aff'd*, 512 F.2d 612, 614 (4th Cir. 1975).

THEREFORE, IT IS ORDERED that plaintiffs' motion for summary judgment be, and the same hereby is, DENIED. IT IS FURTHER ORDERED that defendants' motion for summary judgment be, and the same hereby is, GRANTED. A judgment will be entered accordingly.[18]

---

**18.** Plaintiff's Motion to Amend Complaint to include the Guilford County school board becomes moot with the dismissal of this action.