868 F.2d 90
 51 Ed. Law Rep. 1196
 Daniel K. PALMER, a minor, by his parent and next of friend,
Beverly PALMER, and Beverly Palmer
v.
Peter L. MERLUZZI, Superintendent of Schools for the
Hunterdon Central High School District, and the
Hunterdon Central Board of Education.
Appeal of Daniel K. PALMER and Beverly Palmer.
 No. 88-5395.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 18, 1988.
Decided Feb. 17, 1989.
 
 G. Jeffrey Moeller (argued), Donald F. Scholl, Schaff, Motiuk, Gladstone, Moeller & Reed, Flemington, N.J., for appellants.
 Robert M. Tosti (argued), John E. Croot, Jr., Rand, Algeier, Tosti, Woodruff & Frieze, P.C., Morristown, N.J., for appellees.
 Before STAPLETON, SCIRICA and COWEN, Circuit Judges.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge.
 
 
 1
 This is an appeal from a summary judgment in favor of the defendants, Peter Merluzzi, Superintendent of Schools for the Hunterdon Central High School District, and the Hunterdon Central Board of Education. Plaintiff Dan Palmer, a student and football player at Hunterdon, claims that his Constitutional rights to due process and equal protection were violated when Superintendent Merluzzi suspended him from playing interscholastic football for sixty days. We will affirm.
 
 I.
 
 2
 In September of 1986, Dan Palmer was a senior at Hunterdon Central High School and a starting wide receiver on the high school's football team. He was also enrolled in a high school course called "Careers in Broadcasting Technology." On the evening of September 28, 1986, in order to fill a course requirement, Palmer and three other students were assigned, without faculty supervision, to the school radio station, which is located on the school premises. The next morning, beer stains and a marijuana pipe were discovered at the radio station. Later that day, Palmer, school disciplinarian Dr. Grimm, and Mr. Buckley, Palmer's former football coach, met in Mr. Buckley's office and Palmer was questioned about this discovery. During that meeting, Palmer admitted that the evening before he had smoked marijuana and consumed beer at the radio station.
 
 
 3
 On September 30, 1986, Dr. Grimm sent Mr. and Mrs. Palmer a letter advising them that their son had been assigned a ten-day out-of-school suspension effective from September 30, 1986 to October 13, 1986. The letter asked the Palmers to call Dr. Grimm if they had additional questions and suggested that they and their son consider counseling. The Palmers took no action to contest the ten-day suspension.
 
 
 4
 After Dr. Grimm's meeting with Palmer, Superintendent Merluzzi conferred about the appropriateness of additional discipline with Dr. Grimm, Mr. Buckley, assistant principal Dr. Myers, Mr. Kleber, the faculty director of the radio station, and Palmer's current football Coach, Mr. Meert. Suspension from extra-curricular activities was discussed and all except Dr. Grimm agreed that such a step was appropriate. No specific number of days for such a suspension was discussed, however.
 
 
 5
 Thereafter, Merluzzi made telephone calls to two drug-counseling agencies. These agencies suggested sixty days as an average time for the rehabilitation of someone with a minor drug problem, and Merluzzi ultimately decided that sixty days would be an appropriate period for the students concerned to ponder their actions. All students who were involved in the incident at the radio station received the same punishment.
 
 
 6
 On October 13, the eve of the expiration of the ten-day suspension, the Board of Education met. Palmer's father, James Palmer, hearing "rumors" concerning the possible imposition of additional sanctions on his son, attended the meeting and spoke with Merluzzi shortly before it started. Merluzzi confirmed that he was inclined to impose a sixty-day extra-curricular suspension, but told James Palmer that he could raise the issue with the Board. James Palmer was accorded half an hour in closed session to present his views; he argued that the additional suspension would adversely affect his son's chances of playing football in college and would also reduce his chances of being awarded college scholarships. The Board declined to intervene and, after the meeting, Merluzzi informed all concerned parents that he was definitely going to impose the sixty-day extra-curricular suspension.
 
 
 7
 Subsequent to the imposition of the sixty day extra-curricular suspension, Palmer appealed to the New Jersey State Commissioner of Education for a review of the actions of the defendants. On October 20, 1986, an evidentiary hearing was conducted before Administrative Law Judge Bruce R. Campbell. Judge Campbell found that the "ten-day out-of-school suspension was procedurally faultless and consistent with announced policy." Appendix at 29. With respect to the sixty-day football suspension, however, he concluded that Palmer had been denied procedural due process. First Judge Campbell decided that Palmer's interest in participating in the school's football program was such that due process was implicated. Due process was not afforded, according to Judge Campbell, because Palmer was not given notice of the proposed sixty-day suspension and afforded a hearing thereon. In the course of so concluding, he observed:
 
 
 8
 5. In a case such as the present matter, the necessary elements of due process relative to an exclusion from extracurricular activities can be provided in the general suspension process provided that that part of the penalty going to extracurricular activities be made known to the pupil at the time.
 
 
 9
 6. In the present case, a ten-day suspension was imposed, was consistent with what pupils and parents would expect from reading The Informational Calendar and Student Handbook (J-2) and was in its ninth day before pupil and parents had any official notice that an additional penalty was being considered.
 
 
 10
 7. This eleventh hour, additional penalty, coming without official notice and without any chance to be heard, flies in the face of all notions of fundamental fairness.
 
 
 11
 Appendix at 32.
 
 
 12
 On appeal, the Commissioner of Education affirmed the ALJ's finding that "the actions of the Board's agents in suspending [Palmer] from school for 10 days in all respects comports with the due process requirements set forth in Goss v. Lopez, [419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) ]." Exhibit M, at 4. The commissioner did not, however, accept the ALJ's conclusion that "the decision to increase the penalty imposed on [Palmer] ... rises to the level of requiring that the Board provide to him an additional due process proceeding ..." Id. at 6 (emphasis in original). In the course of reaching this conclusion, the commissioner noted that Palmer "could not or should not have been unaware of the fact that his role as a member of the football team, as well as his status as a student in the school, was in jeopardy when he decided to take the actions he did."[1] Id.
 
 
 13
 The district court granted summary judgment to the defendants, holding that for purposes of due process analysis, Palmer had no property or liberty interest in participating in the school's football program. 689 F.Supp. 400.
 
 II.
 
 14
 Resolution of this appeal does not require that we address the issue found dispositive by the ALJ and the district court--whether procedural due process is required whenever a public school student in New Jersey faces or receives for a breach of discipline solely a suspension from participation in his or her school's athletic program. Palmer did not commit an offense for which athletic suspension was the only potential sanction or the only sanction in fact imposed. Here there was a single proceeding on a single charge that resulted in two sanctions being imposed, a ten-day suspension from school and a sixty-day suspension from athletics. The ultimate issue before us is whether the process received by Palmer in that single proceeding was appropriate given the fact that he faced, and ultimately received, both of those sanctions. We conclude that it was.
 
 
 15
 The threshold issue is whether the interests that could be adversely affected in the proceeding against Palmer were such that the due process clause was implicated. The answer seems clear. In Goss v. Lopez, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the Supreme Court concluded that due process was required when a student faced a ten-day scholastic suspension. A fortiori, due process is required when a student faces a ten-day academic suspension and a sixty-day athletic suspension.
 
 
 16
 Having concluded that "some process" was due, we turn to the issue of how much was due. We know from Goss what process would have been due if only a ten-day academic suspension had been at stake. After balancing the competing interests involved, the Court decided that the student must be given "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." 419 U.S. at 581, 95 S.Ct. at 740. The Court continued, stating that "[t]here need be no delay between the time 'notice' is given and the time of the hearing.... We hold only that ... the student first be told what he is accused of doing and what the basis of the accusation is." Id. at 582, 95 S.Ct. at 740. The Court also stopped short of requiring that the student be given "the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident." Id. at 583, 95 S.Ct. at 740. As long as the student "at least ha[s] the opportunity to characterize his conduct and put it in what he deems the proper context," id. at 584, 95 S.Ct. at 741, due process has been satisfied.
 
 
 17
 Palmer received the process required by Goss. The day after the incident at the radio station, in an informal hearing with Dr. Grimm and Mr. Buckley, he was advised of what had been found in the radio station and thus of the character of the offense being investigated. He then admitted his participation in the smoking of marijuana and the drinking of beer at the station. Palmer's involvement in the activities of that evening has never been disputed. During the conference, Palmer had the opportunity to put the events of the prior evening into what he perceived to be their proper context and could have argued for leniency had he so chosen.
 
 
 18
 Palmer does not argue before us that the hearing afforded him did not comport with the kind of informal hearing contemplated by Goss. Moreover, Palmer acknowledges that due process would not have been violated if only the ten-day suspension from school had been imposed. Rather, Palmer's argument is that a second notice and a second hearing were required because at the time of his conference with Dr. Grimm, he did not have adequate notice that a sixty-day athletic suspension might be imposed upon him.
 
 
 19
 We find this argument unpersuasive. The notice required by Goss is notice of "what [the student] is accused of doing and what the basis of the accusation is." 419 U.S. at 582, 95 S.Ct. at 740. We have been cited to no authority, and we know of none, suggesting that the notice of the charge and supporting evidence in a Goss situation must include a statement of the penalties that could be imposed in the course of the proceeding. We decline to adopt such a requirement in a situation like the one before us, in which the possible sanctions are knowable from previously published materials or are obvious from the circumstances.
 
 
 20
 In this case, Palmer was advised at the outset that he was suspected of consuming alcohol and a drug on school property. The Student Handbook, which was applicable to all students, specified that "alcohol and/or drug use" would, if a first offense, result in "10 days suspension" from school.[2] The Interscholastic Athletic Program policy statement, which was applicable to Palmer and other students participating in that program, warned that "no student may participate who has not demonstrated good citizenship and responsibility." Appendix at 105. Based on these provisions, the nature of the offense, and common sense, we, like the New Jersey Commissioner of Education, are confident that Palmer must have realized from the outset that his football eligibility, as well as his status as a student, was at stake.[3] Accordingly, we hold that Palmer's interview with Dr. Grimm and Mr. Buckley provided just as meaningful an opportunity to argue against the athletic suspension as against the scholastic suspension.[4]
 
 
 21
 Having concluded that Palmer received the process contemplated by Goss, we turn to the issue of whether more than that process was required in this case because Palmer faced not only a ten-day suspension from school but a football suspension as well. As Palmer stresses, the Court in Goss expressly noted that it was addressing itself solely to the procedure that must be provided in connection with a "short suspension, not exceeding 10 days," and that "longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." 419 U.S. at 584, 95 S.Ct. at 741. Palmer urges, as we understand it, that his interest in avoiding an erroneous deprivation of his participation in the football program for sixty days was sufficiently great that before any decision was made concerning the sanction for his misconduct, he should have been given express notice of the fact that his football eligibility was in jeopardy and that he should have been given the opportunity to secure the advice of an attorney before presenting his defense. Although we acknowledge that the sixty-day football suspension had a substantial impact on Palmer, determination of the amount of process due in a given situation involves a balancing of interests and we conclude that, when the balance is struck, the procedure prescribed in Goss was sufficient under the circumstances of this case.
 
 
 22
 Due process is a flexible concept and the process due in any situation is to be determined by weighing (1) the private interests at stake, (2) the governmental interests at stake, and (3) the fairness and reliability of the existing procedures and the probable value, if any, of additional procedural safeguards. Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). In Goss, the Court described the student's interest as one in avoiding "unfair or mistaken exclusion from the educational process with all its unfortunate consequences." 419 U.S. at 579, 95 S.Ct. at 738. Those consequences include not only the loss of the benefit of the educational process but also potential damage to "the students' standing with their fellow students and their teachers" and potential "interfer[ence] with later opportunities for higher education and employment." 419 U.S. at 575, 95 S.Ct. at 736.
 
 
 23
 From the school's and the public's point of view, Goss recognized the need for maintaining order and discipline in our schools without prohibitive costs and in a manner that will contribute to, rather than disrupt, the educational process. As we have noted, the Court concluded that an informal hearing process would reconcile the private and governmental interests and that requiring representation by counsel, cross-examination, and other, more formal procedural safeguards would not sufficiently increase the reliability and fairness of the process to warrant the additional expense and disruption of the educational process.
 
 
 24
 We accept for present purposes Palmer's contention that, while called an extracurricular activity, the school's football program is an integral part of its educational program. Nevertheless, it is but one part of that program and in terms of lost educational benefit, the loss occasioned by a football suspension is far less than that occasioned by a suspension from school for a comparable period of time. In terms of the student's standing with teachers and peers, we believe the potential loss is likely to be a function of the nature of the offense rather than the penalty; it is therefore unlikely to be affected by the fact that the sanction includes an athletic as well as a school suspension. As a general proposition, we believe the same can be said for the potential for interference with later opportunities for higher education and employment. Indeed, Palmer does not argue otherwise. The loss that he emphasizes is the possible loss of the opportunity to play college football. Although we acknowledge that the loss of the opportunity to impress college scouts with one's senior year play can have a significant adverse effect on one's chances for a college football career, we believe it would be unduly disruptive of a school's educational process to require one disciplinary process for football players and similarly situated athletes and another disciplinary process for other students.
 
 
 25
 Since the governmental interest at stake here is the same as that in Goss, since the incremental efficacy of the process proposed over the process afforded is not materially different than the one in that case, and since we find the student's interest to be only slightly greater, we conclude that the process required by Goss was sufficient in the circumstances presented by this case.[5]
 
 III.
 
 26
 Palmer also contends that his suspension violated his right to equal protection under the Fourteenth Amendment. Since participation in extra-curricular activities is not a fundamental right under the Constitution and since Palmer's suspension was not based on a suspect classification, see Moreland v. Western Pa. Interscholastic Athletic League, 572 F.2d 121, 124 (3d Cir.1978), we must examine Palmer's argument under the "rational relationship test." See generally, L. Tribe, American Constitutional Law Sec. 16-2 (2d ed. 1988). We conclude that the disciplinary actions taken by the school were rationally related to a valid state interest. The State has very strong interests in preserving a drug-free environment in its schools and in discouraging drug use by its students. We are unwilling to say that the sanctions imposed on Palmer were not reasonably designed to serve those legitimate interests.
 
 IV.
 
 27
 Since Palmer's suspensions from school and participation in interscholastic football did not violate any right secured by the Constitution, we will affirm the judgment of the district court.
 
 
 28
 COWEN, Circuit Judge, concurring in part and dissenting in part.
 
 
 29
 It is uncontroverted that for the purposes of this appeal Daniel Palmer and some other persons consumed beer and smoked marijuana in the school radio station on the evening of September 28, 1986. Palmer does not challenge the propriety of his initial ten-day suspension from school. Instead, he challenges the imposition of the sixty-day suspension from extracurricular activities. The majority implicitly acknowledges that Palmer has a protected property interest in his continued participation in extracurricular activities, maj. typescript op. at 96, but concludes that Palmer has received due process. I agree that Palmer has a protected property interest in his continuing participation in Hunterdon's football program (assuming eligibility requirements are met). However, because I believe Palmer has not received due process, I respectfully dissent.I.
 
 
 30
 In determining whether Palmer has a protected property interest in extracurricular activities, this Court must apply New Jersey law. Bishop v. Wood, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976) (property interests are defined by state law). Because the Supreme Court of New Jersey has not yet addressed the issue, our task is really one of predicting New Jersey law. Compagnie Des Bauxites de Guinee v. Insurance Co. of N. Am., 724 F.2d 369, 371 (3d Cir.1983); Connecticut Mut. Life Ins. Co. v. Wyman, 718 F.2d 63, 66 (3d Cir.1983).[1]
 
 
 31
 Under New Jersey law, Palmer unquestionably has a legitimate entitlement to a public education. New Jersey law requires that local authorities provide a free education to all residents over five and under twenty years of age. N.J.Stat.Ann. Sec. 18A:38-1 (West 1968 & Supp.1988). New Jersey law further provides for compulsory attendance of all students between the ages of six and seventeen. N.J.Stat.Ann. Sec. 18A:38-25 (West 1968). While no New Jersey statute specifically requires schools to provide extracurricular activities, New Jersey law does require public schools to offer "[a] breadth of program offerings designed to develop the individual talents and abilities of pupils." N.J.Stat.Ann. Sec. 18A:7A-5(d) (West 1968 & Supp.1988). Further, "extracurricular activities, including interscholastic athletics, play an integral part in satisfying the breadth of programs requirement." Burnside v. New Jersey State Interscholastic Athletic Ass'n, Doc. No. A-625-84T7 at 5 (N.J.Super.Ct.App.Div., Nov. 15, 1984) (unpublished opinion); see also, Smith v. Board of Educ. of the Borough of Paramus, 1968 S.L.D. 62, 65 (decision of the New Jersey Commissioner of Education) (quoting Evaluative Criteria, 1960 Edition, of the National Study of Secondary School Evaluation) ("[t]he School provides for two general kinds of educational experiences, the regular classroom activities and those called extracurricular or cocurricular," and "[t]ogether they form an integral whole aimed toward a common objective"), aff'd, by the New Jersey State Board of Education on February 5, 1969.
 
 
 32
 The question of whether a student has a protectible interest in his continuing participation in extracurricular activities has been faced by numerous courts with differing results. Compare Davenport v. Randolph County Bd. of Educ., 730 F.2d 1395, 1397 (11th Cir.1984) (" '[t]he privilege of participating in interscholastic activities must be deemed to fall ... outside the protection of due process.' ") (quoting Mitchell v. Louisiana High School Athletic Ass'n, 430 F.2d 1155, 1158 (5th Cir.1970)); Herbert v. Ventetuolo, 638 F.2d 5 (1st Cir.1981) (high school students had no property right to play interscholastic sports under Rhode Island law and, thus, students who were suspended from the hockey team were not entitled to notice and a hearing); Walsh v. Louisiana High School Athletic Ass'n, 616 F.2d 152, 159 (5th Cir.1980) ("A student's interest in participating in a single year of interscholastic athletics amounts to a mere expectation rather than a constitutionally protected claim of entitlement."), cert. denied, 449 U.S. 1124, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981); Parish v. National Collegiate Athletic Ass'n, 506 F.2d 1028 (5th Cir.1975) (basketball players who lost the opportunity to play in association-sponsored college tournaments through operation of an eligibility rule were not deprived of a "property" interest or a "liberty" interest which is protected by the due process clause); Pegram v. Nelson, 469 F.Supp. 1134 (M.D.N.C.1979) (no formal proceedings were required in a four-month suspension from extracurricular activities); and Dallam v. Cumberland Valley School District, 391 F.Supp. 358 (M.D.Pa.1975) (participation in interscholastic high school competitions is neither a right nor a privilege protected by the due process clause) with Boyd v. Board of Directors of McGehee Sch. Dist., 612 F.Supp. 86, 93 (E.D.Ark.1985) (notice and a hearing were required before a student could be suspended from the football team since "participating in interscholastic athletics must be deemed a property interest protected by the due process clause of the Fourteenth Amendment."); Behagen v. Intercollegiate Conference of Faculty Representatives, 346 F.Supp. 602, 604 (D.Minn.1972) (the interest of college athletes in participation in sports is of such importance that it cannot be impaired without minimum standards of due process); Duffley v. Hew Hampshire Interscholastic Athletic Ass'n, 122 N.H. 484, 446 A.2d 462 (1982) (finding a due process right under state constitution for deprivation of extracurricular activity participation). In reviewing the facts of the instant case and New Jersey case law, the United States Magistrate concluded that "New Jersey case law, consistent with the majority of state and federal courts, specifically rejects the notion that participation in extracurricular activities is anything but a privilege." App. at 129 (citing Dennis v. Holmdel Bd. of Educ., 1977 S.L.D. 388 (decision of the New Jersey Commissioner of Education)).[2] The district court agreed. App. at 107.
 
 
 33
 However, the notion upon which many of the New Jersey cases rely--that participation in extracurricular activities is a mere privilege as opposed to a right--is fast becoming outdated. Indeed, courts and commentators increasingly attack the "privilege" versus "right" distinction.[3] Although New Jersey may not be constitutionally obligated to establish and maintain a system of extracurricular activities, many of its public schools, nevertheless, have done so. The New Jersey statutes implicitly acknowledge the importance of extracurricular activities. Public funds support the schools' various "extracurricular" activities. Further, the Commissioner of Education has required teachers to supervise such activities when called upon to do so.[4] Most importantly, a growing consensus indicates that the programs are not "extra" curricular, but rather, are an integral part of the whole curriculum. See supra, dissenting typescript op. at 98 n. 4 (discussing Paramus ). Authority in New Jersey does support that proposition that "each pupil has a right to the opportunity to participate in interscholastic athletics and other extracurricular activities." Burnside v. New Jersey State Interscholastic Athletic Ass'n, A-625-84T7 at 5-6 (N.J.Super.Ct.App.Div.) (Nov. 15, 1984) (unpublished opinion). Were the New Jersey Supreme Court to consider the issue today, I believe it would recognize a protected interest in participation in extracurricular activities, assuming eligibility requirements are met.
 
 
 34
 .............................................................
 
 
 35
 ...................
 
 
 36
 * * *
 
 II.
 
 37
 The question then becomes what process is due before Palmer's right to participate may be withdrawn. See Morissey v. Brewer, 408 U.S. 471, 483, 92 S.Ct. 2593, 2601, 33 L.Ed.2d 484 (1972). The majority seems to find that no greater procedural protections are required because suspension from extracurricular activities was imposed in conjunction with the ten-day suspension. Its holding appears to be premised on the proposition that while extracurricular activities [i.e., football] are "an integral part of [the school's] educational program," maj. typescript op. at 95, a separate due process hearing is not required for deprivation of each component of that integral whole. This analysis and characterization of the issue ignores the fundamental point that students in New Jersey have the right to an opportunity to participate in extracurricular activities, see Burnside, supra, and that, once accorded that right, it cannot arbitrarily be taken away.[5] The Supreme Court has stated that "[t]he authority possessed by the State to prescribe and enforce standards of conduct in its schools, although concededly very broad, must be exercised consistently with constitutional safeguards." Goss, 419 U.S. at 574, 95 S.Ct. at 736. While it is true that "school disciplinary rules need not be as detailed as the criminal code which imposes criminal sanctions," Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 684, 106 S.Ct. 3159, 3165, 92 L.Ed.2d 549 (1986), students should not be subjected to the unrestrained hands of school authorities who wish to act whenever and however they please.
 
 
 38
 It cannot be denied that Superintendent Merluzzi acted in a wholly arbitrary manner in denying Palmer notice and an opportunity to be heard before an impartial decision-making forum. Merluzzi's own testimony establishes that upon learning of the incident, he reviewed Board Policy No. 138 concerning interscholastic activities, and in particular, the last paragraph of section 3, which provides:
 
 
 39
 No student may participate in a scheduled event if he was not in attendance on the day of the athletic event, or the day preceding a weekend event. No student may participate who has not demonstrated good citizenship and responsibility. No student who has not returned all equipment may participate in a succeeding season.
 
 
 40
 App. at 105. He then met with administrators and the football coach. He solicited their views on an additional penalty. A consensus (not unanimous) was reached in favor of an additional penalty although no specific number of days was then determined. Dr. Grimm, the school disciplinarian, did not favor an additional penalty. Merluzzi then telephoned two counseling agencies and got their views as to an appropriate period of rehabilitation. He believed that under existing Board policies that he was empowered to make and enforce such decisions regarding exclusion from extracurricular activities.
 
 
 41
 The Board met on October 13, 1986. Prior to the meeting, Palmer's father and Merluzzi accidentally met in the hallway. Palmer's father asked Merluzzi, before the meeting if, as rumor had it, Merluzzi was going to invoke a sixty-day exclusion from extracurricular activities. Merluzzi said he would recommend such a penalty. He also stated that he was not seeking Board approval to do so since he had authority to mete out this type of penalty. Nothing was mentioned about the possible additional suspensions until Palmer's father inquired about his son's status. The Board then retired into an executive session and heard statements made by Palmer's father and the recommendations of Merluzzi. After the conclusion of the meeting, no formal action was taken by the Board and the matter was apparently referred back to Merluzzi for further review. Shortly thereafter, Merluzzi informed Palmer's father of the sixty-day suspension.
 
 
 42
 Astonishingly, Merluzzi did not even review the records of the students involved before deciding on the punishment. Instead, Merluzzi relied on recommendations from drug rehabilitation centers without ascertaining whether or not Palmer was in need of "rehabilitation." It is undisputed that this was Palmer's first drug offense in school. There is no indication that Palmer had ever used drugs previously. Thus, it is difficult to conceive how an informed and effective decision regarding discipline can be made in this manner.
 
 
 43
 With regard to James Palmer's "opportunity to be heard," the majority notes that "Palmer's father was advised that a sixty-day suspension was under consideration and was afforded an opportunity thereafter to address the appropriateness of that sanction." Maj. op. at 94 n. 3. However, given the nature of the circumstances in which James Palmer found himself, this is a woefully inaccurate statement. First, I find it troubling that this Court would deem a "rumor" to constitute adequate notice of a sanction of this type. Merluzzi did not advise the parents or students involved of his intended action before October 13, 1986. There is nothing in the record to indicate that the Palmers had been given official notice of the impending action nor is there any indication that someone from the Board had been designated to contact the Palmers for purposes of informing them that further sanctions were to be discussed.
 
 
 44
 Second, the record clearly shows that James Palmers' "opportunity" to address the Board was, at best, an opportunity to "vent" his frustrations before a body that ultimately exercised no authority in the decision to impose the sixty-day sanction. The record indicates that the decision was a foregone conclusion by the time of the October 13, 1986 Board meeting. After hearing oral argument and testimony from Merluzzi himself, the ALJ found that Merluzzi "was not seeking Board approval to do so [mete out the sixty-day suspension] because he had the authority to hand out this type of penalty [himself]." App. at 30. The ALJ additionally found that Merluzzi "had 'mulled over' the decision since his meeting with school administrators on October 2 or 3" and "when he spoke to parents after the October 13 Board meeting nothing would have changed his mind." Id. What the majority refers to as an "opportunity" to be heard was, in reality, nothing more than a statement by James Palmer which fell on the deaf ears of Merluzzi and which was heard by a body having no apparent input in the decision. This mere illusion of an opportunity to be heard should not be deemed sufficient to pass constitutional muster.
 
 
 45
 Finally, the majority "decline[s] to adopt such a requirement [of notice] in a situation like the one before us in which the possible sanctions are knowable from previously published materials or are obvious from the circumstances." Maj. op. at 94. The sanctions were certainly not obvious from past practice nor were they apparent from published materials. The record indicates that this was the first time punishment in excess of ten days had been imposed under Hunterdon's drug policy. Further the School Handbook provided only for a ten day suspension for a first offense. It was only after Palmer's incident that the school regulations were modified to provide, for a first offense, "10 days' suspension from school and all functions" and "60 calendar days' suspension from school activities starting with the student's return to school." App. at 147.[6]
 
 
 46
 Because I believe Superintendent Merluzzi acted in a wholly arbitrary manner in taking away a protected property interest and what may have been Palmer's only avenue to higher education, I respectfully dissent.
 
 
 
 [1]
 Palmer applied to the Appellate Division of the Superior Court of New Jersey for a stay of the commissioner's order. The Appellate Division denied that application. Plaintiff then appealed to the Supreme Court of New Jersey seeking imposition of a stay; that court also declined to hear the matter. On October 27, 1986, the Board of Education met and extended to plaintiff's counsel thirty minutes to present oral argument on behalf of the plaintiff to the Board. No witnesses were heard. The next day the plaintiff was provided written notification of the Board's decision affirming the penalty imposed by Merluzzi
 
 
 [2]
 The Student handbook provided that:
 B. If alcohol and/or drug use is confirmed:
 
 
 [1]
 First offense after hearing by principal or designee
 a. Penalty--10 days suspension
 b. The parents will be strongly encouraged to enroll the student in an approved drug rehabilitation program.
 
 
 [2]
 Second offense after hearing by principal or designee
 a. Penalty--21 days suspension
 b. The student must be enrolled in an approved drug rehabilitation program and may not return to school until evidence of such enrollment is presented to the appropriate Administrative Assistant.
 Appendix at 83.
 
 
 [3]
 To the extent Palmer may be arguing that notice was required of the specific possibility that he might be suspended from football for as long as sixty days, we believe the Supreme Court's decision in Bethel School District No. 403 v. Fraser, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), is helpful. There the Court made the following pertinent observation:
 Given the school's need to be able to impose disciplinary sanction for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions.
 
 
 [106]
 S.Ct. at 3166. While there may be circumstances in which the severity of a proposed school disciplinary sanction is such that due process would require a previously published, specific notice of the possibility of a sentence that severe, a sixty-day football suspension does not approach the degree of severity that might be constitutionally suspect. Moreover, we note that Palmer's father was advised that a sixty-day suspension was under consideration and was afforded an opportunity thereafter to address the appropriateness of that sanction
 
 
 [4]
 Contrary to Palmer's contention, we do not believe the Student Handbook provisions for a ten-day suspension from school can reasonably be read as an assurance that football players who chose to use alcohol or drugs will be allowed to play football
 
 
 [5]
 Palmer, citing Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1971), claims that the allegedly defective process he was afforded deprived him of a liberty interest in his good name and reputation, as well as his property interest in participating in the school's athletic program. This does not help his cause for two reasons. First, in Goss, the Court found a deprivation of both a liberty and a property interest and took the student's liberty interest in reputation and employment into account in striking the balance that it did. We do not believe Palmer had more at stake in the way of a liberty interest than did the plaintiffs in Goss. Moreover, Palmer has not alleged or tendered any evidence indicating that he was not guilty as charged. Under these circumstances any injury to his reputation is attributable to his conduct and not to a deficiency of process. Codd v. Velger, 429 U.S. 624, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (Where plaintiff does not challenge the truth of a charge, he has no claim for deprivation of a liberty interest in his reputation without due process of law)
 
 
 [1]
 It is well settled that "[i]n the absence of an authoritative pronouncement by a state's highest court, we may give serious consideration to the opinion of an intermediate appellate court." Aetna Casualty & Sur. Co. v. Farrell, 855 F.2d 146, 148 (3d Cir.1988). While there exist several intermediate appellate decisions as well as decisions by the New Jersey Commissioner of Education pertaining to the issues presented in this case, for the reasons discussed infra, I believe the cases are not indicative of how the New Jersey supreme court would rule today
 
 
 [2]
 In Dennis a high school student was suspended from the high school football team and denied his athletic letter because he violated training rules by consuming alcohol during the season. The student apparently did not dispute his suspension but argued that he was unaware that he could forfeit his letter by drinking. He also contended that he was denied due process because he was never given a full hearing to present his side of the incident
 The Commissioner of Education upheld the suspension and the denial of the letter. He held that "[I am] not aware of any law or administrative rule supporting petitioner's argument that he was denied procedural due process because he was never afforded a hearing before the Board. It must be remembered that participation in interscholastic athletics is a privilege which is subject to rules made by local boards of education." Dennis, 1977 S.L.D. 388, 391.
 The decision in Dennis has been followed in two recent cases. See H.O. v. Montgomery Twp. Bd. of Educ., OAL Dkt. Educ. 6887-85 (March 12, 1986), adopted by the N.J. Comm'r of Educ. (April 28, 1986); L.L.S. v. Board of Educ. of the Borough of Haddonfield, OAL Dkt. Edu. 5009-86 (Sept. 26, 1986), adopted by the N.J. Comm'r of Educ. (Oct. 30, 1986) (there is no right to participate in school band as a drum major); Winfield Brooks v. Regan, No. 81-3610 at 5 (D.N.J. Dec. 2, 1982) (Fisher, C.J.) (unpublished) (holding that "since plaintiff Winfield Brooks had no property interest in playing football, this court need not determine if he was dismissed in accordance with due process.").
 
 
 [3]
 For example, several respected commentators on constitutional law have suggested that:
 [T]he right-privilege distinction has come to an end as both courts and commentators have realized that the individuals should not be subjected to the unfettered discretion of government to withhold even "privileges." Such a rule would leave many individuals at the mercy of a bureaucratic system and threaten the liberties protected by the Bill of Rights. When the government acts to dispense benefits, it must conform to the restrictions of the Constitution, which means that it may not deprive someone of an interest to which they are otherwise entitled without a procedure to determine the basis for the deprivations.
 R. Rotunda, J. Nowak & J. Young, 2 Treatise on Constitutional Law Substance and Procedure Sec. 17.5 at 235 (1986) (footnotes omitted); see also Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (the Court used the term "statutory entitlement" and stated that "[i]t may be realistic today to regard welfare entitlements as more like 'property' than a 'gratuity.' "). Id. at 262 n. 8, 90 S.Ct. at 1017 n. 8.
 
 
 [4]
 For example, in Smith v. Board of Educ. of the Borough of Paramus, 1968 S.L.D. 62 (decision of the New Jersey Commissioner of Education), aff'd by the New Jersey State Board of Education on February 5, 1969, the Commissioner of Education determined that teachers are legally bound to perform extracurricular supervisory activities assigned to them by the Board of Education. The Commissioner reasoned that "the public school curriculum is not restricted to the few areas of study which the Legislature has prescribed." Id. at 64. In an extended discussion on the importance and significance of extracurricular activities, the Commissioner remarked:
 Boards of Education are free to determine whatever other learning experiences are suitable to the pupils to be served and will best achieve the aims and objectives of the schools. In pursuit of the goal of the highest degree of self-realization possible for each individual, the schools have traditionally sought an even greater diversity than is provided by formal classroom learnings. Thus, they have provided opportunity for a wide variety of extra-classroom activities in which pupils are encouraged to explore and pursue individual interests. Historically, these pursuits became known as "extracurricular," unfortunately connoting something which was tacked on and of minor importance compared with the classroom teaching program. Later, resort was had to use of the term "cocurricular" in an effort to establish the parallel significance of these curriculum elements. The semantics used are of no moment. In Willett v. Colts Neck Board of Education, 1966 S.L.D. 202, 206, the Commissioner held that school affairs such as dances, concerts, dramatic productions, athletic events and the like, although generally referred to as "extracurricular" were better designated "extra-classroom," and are certainly part of the total curriculum.
 The existence of a board [sic] and well-developed program of student activities is an essential factor in the approval or accreditation of any secondary school. The Commissioner notes that the "Guidelines for Approval Through Self-Study for New Jersey Secondary Schools," a manual developed by the Office of Secondary Education for use in the evaluation and approval of New Jersey secondary schools, pursuant to N.J.S. 18A:45-1, clearly demonstrates that a full and well-conducted program of student activities is a vital element in the assessment of the effectiveness of the school program. Similarly the Evaluative Criteria, 1960 Edition, of the National Study of Secondary School Evaluation, which provides the basis for accreditation of New Jersey secondary schools by the Middle Atlantic States Association of Colleges and Secondary Schools, devotes a full section to the student activity program (pages 241-256), and states as one of the "guiding principles" (page 241):
 "The school provides for two general kinds of educational experiences, the regular classroom activities and those called extracurricular or cocurricular. Together they form an integrated whole aimed toward a common objective * * *."
 In the Commissioner's judgment, therefore, boards of education are not only permitted under the law, but have an affirmative duty and responsibility to develop a broad program of pupil activities beyond formal classroom instruction as an essential part of the curriculum offered.
 Id. at 64-66.
 
 
 [5]
 Few courts have considered the issue in this context. However, in one such case, Pegram v. Nelson, 469 F.Supp. 1134 (M.D.N.C.1979), the district court did engage in a similar analysis. In this case, high school students were given a ten-day suspension from school and a four-month suspension from extracurricular activities. The court held that greater procedural protections were not required merely because the extracurricular activity suspension was imposed in conjunction with the ten-day suspension. There the court stated that:
 If the plaintiff's property interest in public education ... is considered to extend to the total "educational process," then, under certain circumstances, the need for some due process might arguably arise where a student is excluded from participation in extracurricular activities. This is because participation in extracurricular activities can be considered part of the total educational process. It has been recognized that "[t]he educational process ... is not limited to classroom attendance but includes innumerable separate components, such as participation in athletic activity and membership in school clubs and social groups...." Albach v. Odle, 531 F.2d 983, 985 (10th Cir.1976). However, Goss should not be read to establish a property interest subject to constitutional protection in each of these separate components.
 
 
 [469]
 F.Supp at 1139 (footnote and citations omitted)
 However, in Pegram, the court specifically found that "[t]he opportunity to participate in extracurricular activities is not, by and in itself, a property interest." Id. This is not the case in New Jersey, see Burnside, supra, and thus the case is distinguishable on this basis. The court did recognize in Pegram that "total exclusion from participation in that part of the educational process designated as extracurricular activities for a lengthy period of time could, depending upon the particular circumstances, be a sufficient deprivation to implicate due process." Pegram, 469 F.Supp. at 1140 (emphasis in the original). The court in that case went on to state that the court "need not decide ... whether the plaintiff had a right to procedural due process under these facts, for assuming that he did have such a right, he was afforded all the process that he was due." Id. In the instant case--to the contrary--Merluzzi acted in a wholly arbitrary fashion inconsistent with the most fundamental notions of due process.
 
 
 [6]
 The United States Magistrate, despite holding that Palmer did not have a protected property interest, was troubled by the arbitrariness of Merluzzi's actions. She wrote in a Report and Recommendation:
 While I find that defendants' conduct passes the rational relationship test, I must add that this finding does not signify support by this Court of the length of suspension or the manner in which it was determined. Suspending a student from extracurricular activities for sixty days ostensibly to correct a drug/alcohol program [sic] without 1) reading the student's personnel file, 2) determining that a substance abuse problem in fact exists and, 3) ensuring that counseling is available to students who require it raises serious doubts about the corrective value of the punishment.
 App. at 140 n. 11. Additionally, the Administrative Law Judge, in finding that due process had been violated, stated that "[t]his eleventh hour, additional penalty, coming without official notice and without any chance to be heard, flies in the face of all notions of fundamental fairness." App. at 32.